## GRUBB v. GENERAL CONTRACT PURCHASE CORPORATION.

District Court, S. D. New York.

Jan. 7, 1937.

Krause, Hirsch & Levin, of New York City (George C. Levin and Elliot L. Krause, both of New York City, of counsel), for plaintiff.

Harold H. Kissam, of New York City (Lloyd F. Thanhouser, of New York City, of counsel), for defendant.

PATTERSON, District Judge.

The trustee in bankruptcy of William P. Smith Company, Inc., brought an action at law to recover $37,500, alleged to have been received by the defendant as a voidable preference. The $37,500 was made up of three sums—$25,000 received on May 15, 1935, and $6,000 and $6,500 received on May 18, 1935. A jury was waived.

Down to the time of bankruptcy on June 6, 1935, the bankrupt was a corporation engaged in selling automobiles ·at Wassaic, N. Y., under the guidance of William P. Smith. Whatever chances it had of successful continuance in business were ruined by forgeries and frauds committed by Smith. In March, 1935, Smith got in touch with the defendant, a company in the business of buying customers' negotiable paper from concerns selling automobiles and other articles on the installment plan. He proposed that the defendant take over a $25,000 loan that Manufacturers Trust Company had made to the bankrupt a year earlier. The defendant was given to understand that Manufacturers Trust Company wished to get clear of the loan, not because of any dissatisfaction with it, but merely in order to avoid having it rated as a slow loan, and that the trust company would reinstate the loan after a thirty-day interval. The defendant took the matter up with the trust company and was told that the loan would be taken back after thirty days, provided the bankrupt's financial condition should warrant it. The defendant, after making inquiries about the bankrupt's business, decided. to make the loan. On March 23d, the bankrupt gave a $25,000 demand note to the defendant and delivered as collateral security thirteen notes purporting to be those of customers. At the same time the defendant gave the bankrupt a check for $25,000 which the bankrupt indorsed and deposited in its account with the trust company. The old note held by the trust company was paid off by charging it against the bankrupt's account so built up.

In April the defendant informed Smith that it expected the note to be taken up on April 23d. This was in accordance with

the understanding that the loan was to be one for thirty days. Smith made the excuse that the bankrupt's 1934 financial statement would not be ready for a few days, that even after it was ready a little time would be required to get the new loan from Manufacturers Trust Company, and he asked that the note be carried for three or four days. Smith then caused the bankrupt's accountant to send the trust company a financial statement purporting to show the bankrupt's condition at the end of 1934. This statement, false though it was, showed an apparent net worth of over $200,000, and on the strength of it Smith pleaded with the trust company to grant the bankrupt a new loan, so that the $25,000 loaned by the defendant might be paid off. After several refusals the trust company was prevailed upon by Smith on May 14th to grant the bankrupt a new loan of $25,000 for one week, to be secured by customers' notes. The trust company understood that the loan was to take the place of the loan that had been made by the defendant in March. Quigley and Richardson, the defendant's representatives in charge, immediately went to the trust company to close the matter. They produced the collateral notes held by the defendant; several of the collateral notes were overdue and for these Smith produced notes that he claimed were renewals. The renewal notes as well as most of the other collateral notes proved later to be fictitious. Smith signed the bankrupt's notes for $25,000 payable to the trust company to evidence the new loan, also the bankrupt's check for $25,000 payable to the trust company, and gave the note and the check to the officer of the trust company in charge of the matter, the check to be in payment for a cashier's check to be turned over to the defendant. Quigley would not take the bankrupt's uncertified check. But it was too late in the day to issue a cashier's check or to certify the bankrupt's check. On the next morning a cashier's check of the Manufacturers Trust Company for $25,000, payable to the defendant, was handed to Richardson, who then turned over the collateral to the trust company. The $25,000 loan that had been made by the defendant to the bankrupt in March was thus paid off. This is the first transaction which the plaintiff attacks as a voidable preference.

Meanwhile the defendant had been purchasing supposed customers' paper from the bankrupt from time to time; such purchases had commenced on March 26th and amounted to $42,000 by the middle of May. It had also advanced some $12,400 to the bankrupt for the purchase of automobiles at wholesale, such advances being secured by trust receipts or chattel mortgages on the automobiles purchased. Between May 10th and May 16th the bankrupt sent to the defendant some eight checks drawn on its account in First National Bank of Amenia, for a total figure of $13,859.96. Most of the checks were in repayment of loans on wholesale transactions. On May 16th the defendant had word from the Amenia bank that the bankrupt's credit balance was insufficient to meet these checks and that none of them would be paid. Quigley and Richardson pressed Smith for payment. Smith tried to reassure them; he claimed that he had not had time to deposit the bankrupt's collections in the bank and promised that the money would be there the next morning. The money was not there on the 17th. Instead of money Smith had a story about raising $25,000 in the vicinity; in the evening he claimed that he had raised it and that the defendant would get the necessary funds by telegram early the following day. No money arrived on the morning of the 18th. Smith then said that he had made arrangements for the money from other sources, and so he had; $12,500 had been arranged for, $6,000 from Dover Plains National Bank and $6,500 from one Cline. Smith told the cashier of Dover Plains National Bank that he was in a jam with the defendant; that he had to pay it $12,500 at once; that Cline had agreed to loan $6,500. On these representations the bank on May 18th made a loan of $6,000 to the bankrupt, the bankrupt's note for that amount being indorsed by Smith and his father and property owned by Smith and his father being pledged as collateral. The proceeds of the note were placed to the credit of the bankrupt. At the same sitting the bankrupt, through Smith, drew a check for $6,000 payable to the defendant. The bank certified the check. Smith then met Richardson, showed him the certified check, and the two went to Amenia to get the remaining $6,500.

Smith had persuaded Cline to agree to make a $6,500 loan to the bankrupt on a tale about purchasing trucks in Buffalo. Cline was promised collateral security for his loan, but the security that he received from the bankrupt proved to be practically

worthless. Cline did not have the cash to lend, but raised it on his note payable to the Amenia bank. The cashier of the bank knew that Smith was raising the money for the purpose of paying the defendant, and he forced Smith to admit this to Cline. The $6,500 loaned by the Amenia bank to Cline was placed to Cline's credit in the bank. Cline drew his check for $6,500 payable to the bank. The bank, on Smith's instructions, forthwith drew its own check for $6,500 on Guaranty Trust Company, payable to the defendant. The cashier of the bank then handed over both checks (the $6,500 check of the Amenia bank and the $6,000 check certified by the Dover Plains bank), to Richardson who had been waiting for them. The defendant caused the $6,500 check to be certified by Guaranty Trust Company and in due course collected on both checks. These are the second and third payments complained of as voidable preferences.

By this time Smith had reached the end of his rope. Several concerns that held customers' paper had grown suspicious and were closing in. Smith vanished on May 23d. The bankrupt's business came to a standstill at once, and the petition in bankruptcy was filed on June 6th. A condition of hopeless insolvency was revealed. Large sums were owing to banks and finance companies, and the securities for these advances were found to be forged or fictitious for the most part. There were assets not in excess of $90,000, against liabilities of $400,000. Smith pleaded guilty to forgery and is serving sentence.

■■ It is a primary requisite of a preference that property of the insolvent debtor be transferred. Where the property taken by the creditor is not the property of the debtor and the transfer does not deplete the debtor's assets, there is no preference. National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178, 32 S.Ct. 633, 56 L.Ed. 1042. A common instance is the payment of a claim by one secondarily liable. Where payment to a creditor is made by one liable as indorser or guarantor, out of his own funds, the creditor has not received a preference from the insolvent debtor. National Bank of Newport v. National Herkimer County Bank, supra; In re Zaferis Bros. & Co., 67 F.(2d) 140 (C.C.A.9). It does not matter that in the course of the transaction the party secondarily liable may have paid the money to the debtor, to be given by him

to the creditor, and the debtor may have turned it over to the creditor; for in such a case the debtor took the money charged with a fiduciary obligation to employ it toward extinguishment of the particular debt, and the money that the creditor received was never a general asset of the debtor. Citizens' Nat. Bank v. Lineberger, 45 F.(2d) 522 (C.C.A.4); First National Bank v. Phalen, 62 F.(2d) 21, 88 A.L.R. 75 (C.C.A.7); see, also, Bielaski v. National City Bank, 68 F. 723, 725 (C.C.A.2).

■ The result is the same where the payment to the creditor is made by one who has been persuaded by the insolvent debtor to loan him money for the specific purpose of paying off that particular creditor. Here again it makes no difference whether the proceeds of the new loan are transferred directly from the new creditor to the old creditor, or whether the proceeds are paid to the debtor on the understanding that he will turn them over to the old creditor in extinguishment of the old claim. Crosby v. Packer, 22 F.(2d) 611 (C.C.A.1). See, also, In re Zaferis Bros. & Co., supra, 67 F.(2d) 140, at page 141. The assets of the debtor have not been diminished nor have his liabilities been increased. The effect has been simply a substitution of a new creditor for an old one.

■ The three payments made to the defendant have this in common, that they were made from funds supplied by third persons as part of the same transactions as the payments themselves. The $25,000 payment came from Manufacturers Trust Company. That sum was loaned by the lender for the very purpose of enabling the bankrupt to pay off the $25,000 note held by the defendant. The proceeds of the new loan were placed in the bankrupt's bank account, and the bankrupt at the same time drew its check payable to the trust company. The final step in what was intended to be a single transaction was the delivery of a cashier's check to the defendant the next morning. So too as to the $6,000 payment from Dover Plains National Bank. That sum was loaned to the bankrupt for the specific purpose of permitting a payment to the defendant. The $6,000 was credited to the bankrupt's account in the bank; it was no sooner there than it was withdrawn by the bankrupt's certified check payable to the defendant. In both instances the funds were transferred to the bankrupt, but the transfer was only for the purpose of having the

bankrupt make payment to the defendant. The new credits were never free assets of the bankrupt. The $6,500 advanced by Cline did not pass into the bankrupt's hands at all. Cline raised the money by his own note; it was placed to his credit in the Amenia bank; he drew a check to the bank; the bank issued its own check on another bank payable to the defendant. The situation was as if Cline had handed the money directly to the defendant on the bankrupt's instructions. In none of the three cases was property belonging to the bankrupt transferred directly or indirectly to the defendant. There was therefore no preference.

That the bankrupt was insolvent when the defendant received the three payments is too plain for discussion. The proof also indicates that the defendant had reasonable cause at the time to believe that the bankrupt was insolvent. So many unhealthy incidents had come to the defendant's notice that it had reason to believe that there was something radically wrong with the bankrupt's business when it took these payments. But since the payments received did not deplete the bankrupt's estate, there will be a verdict directed for the defendant.