In re ACME–DUNHAM
INCORPORATED,
Debtor.

Robert Scott LINGLEY, Trustee of the Estate of Acme-Dunham Incorporated, Plaintiff,

v.

STUART SHAINES, INC., a New Hampshire corporation with a place of business in Portsmouth, County of Rockingham and State of New Hampshire, and in South Portland, County of Cumberland and State of Maine, and

Stuart N. Shaines, of Portsmouth, County of Rockingham and State of New Hampshire, and

Robert A. Shaines, of Rye, County of Rockingham and State of New Hampshire, and

Howard W. Sibson, of Portsmouth, County of Rockingham and State of Mecaw Industries, a Maine corporation with a place of business in Portland, County of Cumberland and State of Maine, and

RHS Company, a New Hampshire partnership composed of Robert A. Shaines, Howard W. Sibson and Stuart N. Shaines, with a place of business in Portsmouth, County of Rockingham and State of New Hampshire, and Robert A. Shaines, of Rye, County of Rockingham and State of New Hampshire, in his capacity as Executor of the Estate of Ruth H. Shaines, Defendants.

MECAW INDUSTRIES, a Maine corporation with its principal place of business in Portland, Maine, Plaintiff,

v.

Robert A. SHAINES, of Portsmouth, New Hampshire, and

Stuart N. Shaines, of Dover, New Hampshire, and

Howard Sibson, of Portsmouth, New Hampshire, Defendants.

Civ. Nos. 84–0246–P, 83–0204–P.

United States District Court,
D. Maine.

June 12, 1985.

John W. McCarthy, Michael S. Haenn, Rudman & Winchell, Bangor, Me., for plaintiffs.

Ralph I. Lancaster, Jeffry D. Curtis, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Robert J. Keach, Verrill & Dana, Portland, Me., for defendants.

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GENE CARTER, District Judge.

This is an action [1] in bankruptcy in which Plaintiff, the Trustee in Bankruptcy of Acme-Dunham Corporation, seeks to recover as preferences various payments made to four individuals—Ruth Shaines, Robert Shaines, Stuart Shaines and Howard Sibson—and to an array of partnerships and corporations, whose principals were these same individuals. Robert Shaines incorporated Acme-Dunham in order to purchase the Acme-Dunham Division of Mecaw Industries. Stuart Shaines and Howard Sibson were both shareholders and directors of Acme-Dunham. The three men were also partners in RHS Company. Stuart Shaines is the president and controlling shareholder of Stuart Shaines, Inc.

As part of the financing of the acquisition of Acme-Dunham, a note for $320,771.30 was given to Mecaw, personally guaranteed by Robert and Stuart Shaines and Defendant Sibson. Both principal and interest payments were made by Acme-Dunham to Mecaw on that note. In order to finance the acquisition of Acme-Dunham, debentures were sold to Ruth Shaines, Stuart Shaines and Robert Shaines. Interest payments were made on these debentures from February 1, 1981, until December 1, 1982. In order to provide working capital to Acme-Dunham, early in 1982 Robert and Stuart Shaines and Howard Sibson decided that their partnership, RHS Co., would lend Acme-Dunham $100,000. RHS did not make the loan at that time because it did not have the money immediately on hand. Instead, Stuart Shaines, Inc. gave a 90-day loan of $100,000 to Acme-Dunham. It received in return an unsecured promissory note guaranteed by Stuart and Robert Shaines and Howard Sibson. Acme-Dunham repaid the loan from Stuart Shaines in two primary payments, one on April 30, 1982, and the other on July 9, 1982. The principals of the companies intended that the RHS loan would substitute for the Stuart Shaines, Inc. loan before the 90 days had elapsed. RHS, however, was unable to make the loan to Acme-Dunham until August 4, 1982, at which time it advanced $100,000. In return, RHS received an unsecured promissory note from Acme-Dunham.

An involuntary petition in bankruptcy was filed against Acme-Dunham on January 19, 1983. In Count I Plaintiff seeks to recover, under 11 U.S.C. § 547, $106,206.52 from Stuart Shaines, Inc. as an avoidable preference made to an insider of Acme-Dunham within one year of the filing of the petition in bankruptcy. Count II seeks to recover the same amount from Stuart and Robert Shaines and Howard Sibson as insider guarantors of the Stuart Shaines, Inc. loan, who received a preference under § 547 through repayment of that loan by Acme-Dunham. In Count III, Plaintiff seeks to recover payments of principal and interest in the amount of $45,132 made to Mecaw within the 90 days before filing of the petition as avoidable preferences. Count IV also seeks to recover as a § 547 preference from the guarantors of the Mecaw note, Robert and Stuart Shaines and Howard Sibson, $65,660 in payments of principal and interest made to Mecaw on the Mecaw note within one year of the

---

1. Actually, the motion dealt with here relates only to one part of two actions which have been consolidated for purposes of discovery.

filing of Acme-Dunham's petition in bankruptcy.

In Counts V through VII, Plaintiff seeks to recover as insider preferences the interest payments made within one year of the filing of the petition in bankruptcy on the debentures issued by Acme-Dunham to Ruth, Stuart and Robert Shaines. Ruth Shaines, the mother of Stuart Shaines and Robert Shaines, is now deceased and Robert Shaines is the executor of her estate. Finally, in Count VIII, Plaintiff seeks to avoid as insider preferences four interest payments that were made on the RHS loan.

Defendants now move for summary judgment on Counts I and II. They assert that the repayment of the Stuart Shaines, Inc. loan was not a preference because Stuart Shaines, Inc. was not an insider and because the repayment was part of the substitution of the RHS loan for the Stuart Shaines, Inc. loan and did not result in a diminution of the debtor's estate. The Shaines Defendants also move for partial summary judgment on Count IV and for summary judgment on Counts V, VI, VII and VIII on the grounds that the interest payments made on the Mecaw note, the debentures, and the RHS loans were made in the ordinary course of the debtors' business and, therefore, were not avoidable under § 547(c)(2). If the RHS loan is not treated as a substituted obligation, Defendants move for partial summary judgment for Robert and Stuart Shaines and Howard Sibson on Counts II, IV, VI and VII on the grounds that, under 11 U.S.C. § 547(c)(4), those Defendants advanced $100,000 in unsecured new value subsequent to most of the alleged preferential transfers.

## I.

In examining the alleged preferential transfers, this Court will apply the 1979 version of 11 U.S.C. § 547(b). Pub.L. 98–353, § 553(a), 98 Stat. 333 (1984). Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

    (1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In addition to the express statutory requirements of a preference, many courts, including the Court of Appeals for the First Circuit, have held that for a transfer to be preferential in the forbidden sense, it must "diminish the fund to which creditors of the same class can legally resort for payment of their debts." *Kapela v. Newman*, 649 F.2d 887 (1st Cir.1981) (*citing Collier on Bankruptcy* § 60.20 (14th ed. 1977) at 859–60).

## II.

Defendants assert that the repayment by Acme-Dunham of the Stuart Shaines, Inc. loan was part of a substitution of the RHS loan for that loan. They have cited various cases which contain general language to the effect that the substitution of a new loan for a prior one does not constitute a preferential transfer because no property of the debtor can be said to change hands. *See, e.g., Matter of Quest, Inc. of Virginia*, 17 B.R. 359 (Bkrtcy.E.D.Va.1982); *Grubb*

*v. General Contract Purchase Corp.,* 18 F.Supp. 680, 682 (S.D.N.Y.1937). The situations contemplated by the courts in the cases cited by Defendants are markedly different from that posed by the facts in this case. In the cases relied upon by Defendants, the substitute loan was made virtually contemporaneously with repayment of the prior loan. Moreover, the money challenged as a preference was never really part of the debtor's estate which would have been available to general creditors but for the challenged transfer.

In *In re Quest,* for example, the Court found no preferential transfer where the defendant bank retained $143,110.23 owed it on a previous loan when it issued a new $150,000 loan to the debtor. *In re Quest,* 17 B.R. 359. The Court emphasized that the transaction was a paper one which placed no property of Quest in the bank's hands. *Id.* at 361. Similarly, in *Grubb* the Court stated that although the new creditor deposited money in the bankrupt's account, "the bankrupt *at the same time* drew its check payable to the trust company." *Grubb,* 18 F.Supp. at 682 (emphasis added). The other sum in that case was "no sooner [credited to the bankrupt's account] than it was withdrawn by the bankrupt's certified check payable to the defendant." *Id.* The Court again stated that "[t]he new credits were never free assets of the debtor." *Id.*

In *In re Zaferis Bros.,* 67 F.2d 140 (9th Cir.1933), another case cited by Defendants, the guarantor paid debtor's bank overdrafts directly, taking in return a promissory note. The appellee argued in that case that a preference had occurred because there was *a moment* at which the sum loaned was in the bankrupt's control. The Court found the situation "entirely different" from one in which a third person gives a failing concern funds and a free hand to use them as general assets. "At no time were the credits, supplied by James, at the complete disposal of the corporation." *Id.* at 141. Also cited by Defendants is *In re Brent Explorations, Inc.,* 31 B.R. 745 (Bkrtcy.D.Colo.1983), in which a creditor argued that funds paid him un-

der an unperfected assignment of proceeds of an oil well were not preferential transfers because the debtor was only a conduit for the proceeds. The Court found a preference because "Brent was not divested of control over the proceeds" in spite of the assignment. As the Court stated, "Brent still received the funds ... and could have used them for any purpose it wished rather than forwarding them to Karst." *Id.* at 750.

The Court cannot accept Defendants' contention on the present record that payment of the Stuart Shaines, Inc. loan was merely part of the substitution of the RHS loan for that prior loan. First, one major repayment of the Stuart Shaines loan took place more than three months before RHS loaned the money and the final repayment occurred almost a month before advance of the RHS funds. These transactions did not represent a virtually contemporaneous exchange of one debt for another. More importantly, however, Acme-Dunham was at all times in control of the funds it used to pay Stuart Shaines, Inc. It did not use the RHS funds for that purpose. In fact, it used its own funds which, but for the payments to Stuart Shaines, Inc., would have been available to other unsecured creditors. If Acme-Dunham had chosen, as it might have, to use its funds to pay some other unsecured creditor, that payment would have been a preferential transfer. Repayment of the Stuart Shaines, Inc. loan stands in no different position despite the fact that Defendants attest, and the Court does not dispute, that the original intent of the parties was that RHS would substitute its own loan to Acme-Dunham for that of Stuart Shaines, Inc. In consideration of an alleged preference under section 547, intent or motive is not a material factor: "Generally speaking it is the *effect* of the transaction rather than the debtor's or creditor's intent that is controlling." 4 *Collier on Bankruptcy,* ¶ 547.01 at 547–13 (15th ed.1985).

The effect of the transaction challenged here was to diminish the estate of the

debtor, making less money available for other unsecured creditors. The Court does not accept Defendants' theory of no diminution of the estate because of the influx of the $100,000 from the loan by RHS. RHS and Stuart Shaines, Inc. are separate entities, and Defendants have not shown that RHS was in any sense bound to make the $100,000 loan to Acme-Dunham for the express purpose of replenishing the $100,-000 paid to Stuart Shaines, Inc. The Court finds, therefore, that the repayment of over $100,000 to Stuart Shaines, Inc. constituted a transfer of the debtor's property which diminished the debtor's estate. Those required elements of a preferential transfer under section 547(b) are therefore met; summary judgment on this theory is, therefore, inappropriate.

### III.

Defendants also argue that Stuart Shaines, Inc. is not an insider of Acme-Dunham because Stuart Shaines, Inc. is not an affiliate of Acme-Dunham within the meaning of 11 U.S.C. § 101(25)(E) and "none of the other definitions apply in any sense." Memorandum of the Shaines Defendants at 15. If Stuart Shaines, Inc. is not an insider, then the trustee may not challenge transfers made to it outside the 90-day period set forth in 11 U.S.C. § 547(b)(4)(A). 11 U.S.C. § 547(b)(4)(B). Defendants misperceive the nature of the inquiry to be conducted under the statute to determine if an entity is an insider.

■ For purposes of the Bankruptcy Code, an insider is an entity or person with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor." S.Rep. No. 95–989, 95th Cong.2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5810. If the debtor is a corporation, as it is here, insiders may include directors, officers, or persons in control of the debtor, partnerships in which the debtor is a general partner, general partners of the debtor or relatives of a general partner, director, officer or person in control of the debtor. 11 U.S.C. § 101(25)(B)(i–vi). Insiders may also include affiliates of the debtor, insiders of affiliates or managing agents of the debtor. 11 U.S.C. § 101(25)(E) and (F).

■ In the legislative history, the term "insider" is referred to as "open-ended because it is not susceptible of precise specification." S.Rep. No. 95–989, 95th Cong.2d Sess., *reprinted in* 1978 U.S. Code Cong. & ·Admin. News at 5810. That the definition is to be flexibly construed is also plain from the statutory language. Rather than stating what an insider *is* the statute provides that insider "includes" the examples set forth above. Given the flexibility of this definition, this Court views the determination of insider status as a question of fact which must be decided on a case-by-case basis. *See Matter of Missionary Baptist Foundation*, 712 F.2d 206, 210 (5th Cir.1983). It is clear then that even though Stuart Shaines, Inc. may not specifically fall within the examples set forth in the statute, it may still be an insider. Defendants' Motion for Summary Judgment on this ground must, therefore, be denied.[2]

### IV.

Defendants also seek either full or partial summary judgment on Counts IV through VIII on the grounds that interest payments made by Acme-Dunham on the promissory notes to Mecaw and RHS, and on the debentures were transfers made in the ordinary course of business of the debtor. Subsection (c)(2) of section 547 provides an exception to the trustee's power to avoid preferential transfers:

to the extent that such transfer was—

---

**2.** Plaintiff has asserted in his statement of issues of material fact that a genuine issue remains as to whether Stuart Shaines, Inc. is an insider. In his brief, Plaintiff asks the Court to determine that Stuart Shaines, Inc. is an insider. Plaintiff does not have a motion for summary judgment before the Court and is in a contradictory position given the Rule 19(b)(2) statement filed. The Court will not decide the factual issue of whether Stuart Shaines, Inc. is an insider at this time.

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

The Mecaw promissory note was executed on January 2, 1981. It provided that Acme-Dunham would pay Mecaw $320,-771.30 over five years, with interest of 12% per year on the amount that remains unpaid. The interest was to be paid in level installments on the last day of each month. Prepayment of the note was permitted. The RHS loan, executed August 4, 1982, had no maturation date and prescribed monthly interest on the unpaid principal balance. The debentures were issued about December 30, 1980. They bore interest of 15% per year which was to be paid monthly. In case of prepayment of the debentures, Acme-Dunham was required to pay the holders a fixed amount for accrued interest above the principal. Defendants received regular monthly payments representing interest on the debentures and the RHS note. It also received payments of interest and principal on the Mecaw note.

Defendants argue that the interest payments were payments made to Defendants in the ordinary course of both the debtor's and Defendants' business within the meaning of section 547(c)(2). They contend that a debt for interest, as distinguished from the principal on a loan, is incurred when it becomes due. The interest on the various loans at issue here became due monthly on particular dates.[3] Defendants conclude that because they received payments of interest within 45 days after the dates that they were due that they qualify for the exception. Plaintiff contends, however, that section 547(c)(2) was not intended to apply to long-term credit and that even if it were, a debt for interest is incurred at the time of the making of the loan. Therefore, these interest payments would have been incurred outside the 45-day period.

The issues raised here involve matters of statutory construction and policy that have not been uniformly resolved by the courts addressing them. Both sides cite well-reasoned opinions supporting their positions. After a thorough examination of the problem, however, the Court remains unpersuaded that the exception for payments made in the ordinary course of business was meant to apply to long-term loans and specifically to the interest component of payments on such loans divorced from payments on the principal.

■ Under the old Bankruptcy Act there was no express exception for payment of debts made in the ordinary course of business. There was, however, a judicially-created exception, the current expense rule, which provided an exception for regular business expenses paid by the debtor. Kaye, *Preferences Under the New Bankruptcy Code*, 54 Am.Bankr.L.J. 197, 201–02 (1980). The current expense rule was premised on the idea that allowing the debtor to remain in business was best for the estate. Another reason for the exception was that current expenses were not considered antecedent debts. *Id.* According to at least one commentator, the rationale for the current expense rule and the exception set forth in section 547(c)(2) is the same: "no diminution of the estate, payment not for antecedent debt, and allowing the debtor to stay in business." *Id.* Reinforcing this interpretation is another commentator's description of the ordinary course of business exception as insulating "ordinary trade credit transactions that are kept current." Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am. Bankr.L.J. 173, 186 (1979). Levin explains

---

**3.** The trustee argues that there remains a general issue of material fact as to when the debt for the interest payments accrued. The Court thinks this is a legal question and when that quesiton is solved, the record supplies dates for either of the possibilities, which can then be measured against the 45–day period prescribed in section 547(c)(2).

that the 45-day limit was chosen because it reflected a normal trade cycle. *Id.* The Court finds these descriptions of the purpose and history of the ordinary course exception persuasive and agrees with the Court of Appeals for the Seventh Circuit that the exception was not intended for credit transactions which will remain unpaid for a long time. *Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981). *See also, In re Goodman Industries, Inc.,* 21 B.R. 512, 522–23 (Bkrtcy.D.Mass.1982); *In re McCormick,* 5 B.R. 726 (Bkrtcy.N.D. Ohio 1980); *In re Bowen,* 3 B.R. 617, 619 (Bkrtcy.E.D.Tenn.1980). The *Barash* case involved installment payments on consumer credit transactions, which are highly similar to the long-term loans at issue here.

Defendants rely on *In re Iowa Premium Service Co., Inc.,* 695 F.2d 1109 (8th Cir. 1982), in which a divided *en banc* Court held that interest payments, as distinguished from principal payments, on a long-term bank loan are subject to exception under section 547(c)(2). In that case the Court distinguished *Barash,* finding that the Court had not addressed the question of interest payments as separate from principal payments. The Court in *Iowa Premium Service* accepted the *Barash* court's interpretation of section 547(c)(2) to the extent that it held that a debt is incurred on the date when the debtor first becomes legally bound to pay. The court then found that the debt for interest payments where interest was due monthly was incurred on a monthly basis because the debtor had no obligation to pay the interest when the note arose but, instead, only became obligated to pay as it used the money. Because the debt for interest was incurred each month, on a continuing basis, the court found that the monthly interest payments had been made within 45 days of the date the debt was incurred and were subject to the exception.

This Court thinks that the *Iowa Premium* court has taken a rather artificial and unnecessarily limited view of what occurs when a long-term loan is made. A loan is not really an ongoing series of transactions between the parties but a single transaction in which the debtor receives the principal and in consideration agrees to repay it along with whatever interest accrues. While the payment of interest may be contingent, the obligation to pay it, if necessary, arises when the debtor gets a property interest in the consideration exchanged. *See In re Brown,* 20 B.R. 554 (Bkrtcy.S.D. N.Y.1982). It seems clear to this Court, as it did to the three dissenters in *Iowa Premium Service,* that that occurs when the debtor accepts the money from the lender.[4] *See Iowa Premium Service,* 695 F.2d at 1114 (Ross, Heaney and McMillian, J.J., dissenting). It is for this reason that the *Barash* court did not distinguish between payments of interest and principal in its discussion of the issue now before this Court.

The *Iowa Premium* court stated that its analysis, which allows interest payments to fall within the ordinary course of business exception, comports with the policy of the Code to protect ordinary trade credit transactions. Since a bank's product is the continued use of money, allowing banks to fit within the exception puts them in the same situation as other trade creditors. This Court sees a marked difference between a long-term loan and the ordinary credit transactions protected by section 547(c)(2). Trade credit transactions are exactly that—a two-way exchange. They further the policies of the Code because they allow the debtor to continue on in business and in the narrow context of ongoing trade exchange, they do not diminish the estate for it is replenished by the goods or services paid for. A long-term loan is an antecedent debt in the traditional sense. The monthly payments of interest do not represent ongoing trade transactions because the decision to pay them was made far in advance of the payment (at the time the loan was negotiated) and in fact nothing is

---

**4.** The majority in *Iowa Premium Service* suggested that the use of the money for another day is new consideration each day. Again, this Court thinks that that characterization belies what really occurs.

exchanged at the time of the payments with the debtor which helps him to continue in business. There is merely an outflow of money from the estate.

As the Court in *In re Brown*, 20 B.R. at 556, stated, the 45-day limitation period "continued the concept of protection for short-term payments." The 45-day period then implicitly refutes the construction adopted by the majority in *Iowa Premium Service* since that construction was based on the explicit policy decision that banks and other long-term lenders should be protected. *In re Iowa Premium Service*, 695 F.2d at 1112. If long-term lenders are to be protected under the Code, Congress should make the decision. *See Barash*, 658 F.2d at 511. The Court, therefore, will deny Defendants' Motion for Summary Judgment on Counts IV, V, VI, VII, and VIII.

### V.

 Finally, the Court will address Defendants' argument that because Stuart Shaines, Robert Shaines and Howard Sibson advanced $100,000 value to the debtor through the RHS loan, the trustee may not avoid *in toto* alleged preferential transfers made to these individuals either in the form of interest payments or decreased liability on loans which they had guaranteed. Section 547(c)(4) provides that the trustee may not avoid transfers

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise avoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

The question posed by the facts here is whether the creditors to whom the alleged preferential transfers were given are, for purposes of the statute, the same as the creditor which gave new value. The Court will not resolve this legal issue now. The parties have briefed it only in conclusory

fashion, and even if the Court were to decide, as Defendants urge, that the individual partners may take advantage of the new value exception for the $100,000 advanced to debtor by RHS Co., summary judgment would not be available. There would remain a genuine issue of material fact regarding the partners' various interests in the partnership. Fed.R.Civ.P. 56(c). At the very least, it seems clear, as Plaintiff suggests, that the partners would not each be entitled to $100,000 credit for new value since only $100,000 was advanced by RHS.

Accordingly, it is ORDERED that Defendants' Motion for Summary Judgment be, and is hereby, DENIED.