**In re Tina ADAMS, Debtor.**

**Gary Growe, Trustee, Plaintiff,**

v.

**AT & T Universal Card Services, a/k/a Universal Card Services, Defendant.**

**Bankruptcy No. 99–10485.**
**Adversary No. 99–1024.**

United States Bankruptcy Court,
D. Maine.

Nov. 18, 1999.

Gary M. Growe, Bangor, ME, for plaintiff.

Jerome J. Gamache, Windham, ME, for defendant.

## Memorandum of Decision

JAMES B. HAINES Jr., Chief Judge.

Submitted on a stipulated record is the Chapter 7 trustee's complaint invoking U.S. Bankruptcy Code § 547(b)[1] to avoid the transfer of $3956.80 by the debtor, Tina Adams, to the defendant, AT & T Universal Card Services ("AT & T"), approximately one month before she filed her bankruptcy petition. For the reasons below, I conclude that the trustee may avoid the transfer as a preference.[2]

### Facts

In its entirety, the parties' stipulation provides:

1. Debtor filed a voluntary petition under Chapter 7 on March 27, 1998.

2. Debtor had antecedent debt to AT & T Universal Card Services in the amount of $3956.80.

3. Sometime prior to filing, debtor made written application for a credit card from MBNA. During a telephone conversation with the MBNA representative, she was asked if she wanted any balance transfer checks to allow her to pay off preexisting higher rate credit cards.

4. She agreed, and was sent blank checks which would be repaid pursuant to a credit card agreement.

5. On March 9, 1998, debtor made out one of the MBNA checks to AT & T Universal Card Services in the amount of $3956.80.

6. It is the debtor's recollection that she decided whom to pay with the checks.[3]

### Discussion

#### 1. The Statute

The Code's preference avoidance provisions discourage creditors from "racing to dismember the debtor" on the eve of bankruptcy and "facilitate[ ] the prime bankruptcy policy of equality of distribution among creditors of the debtor." McCuskey v. National Bank of Waterloo (In re Bohlen Enters., Ltd.), 859 F.2d 561, 566 n. 10 (8th Cir.1988); See also Lewis v. Providian Bancorp (In re Getman), 218 B.R. 490, 492 (Bankr.W.D.Mo.1998) ("A primary purpose of the preference statute is to facilitate equality of distribution among creditors of the debtor."). I must analyze AT & T's defense with these objectives in mind.

Utilizing § 547(b) of the Code,

the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

---

1. Unless otherwise noted, all references to statutory sections are to the Bankruptcy Reform Act of 1978 ("Code" or "Bankruptcy Code"), as amended, 11 U.S.C. § 101 et seq.

2. There are no factual disputes. This memorandum sets forth my legal conclusions in accordance with Federal Rule of Civil Procedure 52 and Federal Rule of Bankruptcy Procedure 7052.

3. The stipulation establishes what the parties agree to be all the operative facts and renders it unnecessary to discuss issues relating to the burden of proof and whether it shifts depending on the nature of the defendant's evidence. See Kaler v. Community First Nat'l Bank (In re Heitkamp), 137 F.3d 1087, 1089 (8th Cir. 1998); Tolz v. Barnett Bank of South Florida, N.A. (In re Safe–T–Brake of South Florida, Inc.), 162 B.R. 359, 364–65 (Bankr.S.D.Fla. 1993).

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

§ 557(b).[4]

■ Though courts have analyzed at length § 547(b)'s five express elements, this case turns on a preferential transfer's "threshold requirement": the targeted transfer must have been a transfer of an "interest of the debtor in property." *In re Bohlen Enters., Ltd.*, 859 F.2d at 564. *See also* § 547(b). The trustee contends that Adams's $3956.80 payment to AT & T was such a transfer. Invoking the "earmarking doctrine," AT & T contends that it was not.

### 2. The Earmarking Doctrine

The "earmarking doctrine" is purely a judicial construct. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565; *In re Spitler*, 213 B.R. at 997 (relying on *In re Bohlen Enters., Ltd.*). In the preference context it was first applied to triangular relationships among an "old" creditor (the preference defendant), the debtor, and a guarantor cum "new creditor." *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565 (describing origins of the doctrine). In the classic instance of earmarking, the disputed transfer is a pre-bankruptcy payment by the debtor's guarantor directly to the old creditor. The doctrine safeguards the guarantor from double jeopardy: the peril of remaining beholden to the debtor's old creditor (who has been divested of its payoff by preference avoidance) while at the same time seeing the money meant and spent to satisfy the original debt returned to the bankruptcy trustee. *See In re Getman*, 218 B.R. at 492. Thus, "earmarking" originally denoted the agreement pursuant to which funds loaned to the debtor by the guarantor/new creditor flowed to the old creditor. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565.

The earmarking doctrine is conjoined with the § 547(b) threshold requirement that the transfer be of an "interest of the property of the debtor" by a theoretical pivot: The guarantor's direct payment of the obligation or the express agreement between the guarantor and the debtor that the money be used to pay the guaranteed obligation forecloses the debtor ever obtaining an interest in the funds. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565; *In re Spitler*, 213 B.R. at 998; *In re Safe–T–Brake of South Florida, Inc.*, 162 B.R. at 365.

Although not preordained by "the march of history,"[5] the doctrine has been extend-

---

**4.** Section 547(c) provides eight safe-harbors for creditors otherwise susceptible to the trustee's subsection (b) avoidance powers. *See* § 547(c). Though it pleaded two of these as affirmative defenses in its answer to the trustee's complaint, AT & T does not press these defenses in its submission to the court. At least one court has rejected the two subsection (c) defenses AT & T has pled, "ordinary course of business" and "contemporaneous exchange," on similar facts involving the debtor's balance transfers between credit card accounts. *See Yoppolo v. Greenwood Trust Co. (In re Spitler)*, 213 B.R. 995, 999–1000 (Bankr.N.D.Ohio 1997); *see also Mazer v. Broadway Southwest (In re Roemig)*, 123 B.R. 405 (Bankr.D.N.M.1991)(analyzing ordinary course of business and contemporaneous exchange defenses proffered by credit card company receiving a non-balance transfer account payoff).

**5.** In its full-hearted embrace of an expansive earmarking doctrine, the court in *In re Safe–T–Brake of South Florida, Inc.* dismissed the trustee's argument that the doctrine should be

ed beyond its original domain.[6] It has been employed in situations where a debtor handles the funds as they flow from the guarantor/new creditor to the old creditor. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565 ("Where the guarantor, instead of paying the old creditor directly, entrusted the new funds to the debtor with instructions to use them to pay the debtor's obligation to the old creditor, the courts quite logically reached the same result."). Such an extension may have been but a baby step, but "the doctrine was expanded [further] to encompass *any* situation where a subsequent loan was made on the condition that it be used to repay an existing loan." *In re Spitler*, 213 B.R. at 998 (emphasis added).[7]

Applying the earmarking doctrine to non-guarantor three-party transactions, the courts have employed two, not entirely distinct, tests.

First, for some courts "the determinative issue" in nonguarantor earmarking "[is] whether the debtor exercised dominion and control over the loan proceeds." *In re Spitler*, 213 B.R. at 998. *See, e.g., In re Safe–T–Brake of South Florida, Inc.*, 162 B.R. 359, 365-66 & n. 3 (Bkrtcy. S.D.Fla.1993) (adopting the "dominion and control" test propounded by the Judge Flaum dissenting in *In re Smith*, 966 F.2d

1527 (7th Cir.1992) as "the key issue" for an earmarking determination, rejecting the "alternate earmarking test" set forth in *In re Bohlen Enters., Ltd.*); *see also In re Getman*, 218 B.R. at 493 (relying on *In re Bohlen Enters., Ltd.* but emphasizing the debtor's ability to choose where to apply the funds as determinative of a non-earmarked transaction).

■ Other courts, rather than looking for the presence or absence of the debtor's "dominion and control," employ the earmarking test the *In re Bohlen Enters., Ltd.* court articulated. I prefer that test, as it assures the inquiry will remain tethered to the native objectives of the earmarking doctrine. To qualify as an earmarked transfer, the transaction must (1) involve "an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt"; (2) "performance of that agreement according to its terms"; and (3) when all is said and done, the bankruptcy estate is not diminished—the debtor's creditors are not disadvantaged—by the transaction. *In re Bohlen Enters., Ltd.*, 859 F.2d at 566.[8]

### 3. Applying the Law

■ Applying the law to the facts before me, the trustee prevails. The stipu-

limited to guarantor situations as ignorant of "the march of history." 162 B.R. at 364.

**6.** The *In re Bohlen Enters., Ltd.* and *In re Spitler* courts have questioned expansion of the doctrine beyond the guarantor context. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 566; *In re Spitler*, 213 B.R. at 998 (noting *In re Bohlen Enters., Inc.*'s concern and relying on its reasoning). With limited qualifications, *see infra* note 7, I share their misgivings.

**7.** There are other preference scenarios, closely correlated with the classic guarantor payoff, in which the doctrine has appeared (*e.g.,* when the new creditor steps into the old creditor's shoes on a *secured* obligation.) *See In re Heitkamp*, 137 F.3d at 1089 ("Because the transfer of the mortgage interest to the bank merely replaced the subcontractors' security interest, there was no transfer of the [debtors'] property interest avoidable under

§ 547(b)"). And there are other instances where the debtor is entrusted with funds in a fiduciary capacity or as a trustee, duty-bound to use them to pay the old creditor. *See In re Bohlen Enters., Ltd.*, 859 F.2d at 565–66. Although the earmarking doctrine might be invoked in such circumstances, the debtor's lack of a property interest in the funds might be confronted more straightforwardly. *See McLemore v. Third Nat'l Bank in Nashville (In re Montgomery)*, 983 F.2d 1389, 1393 (6th Cir.1993)(describing a hypothetical "constructive trust" situation in which the funds, had they not been transferred, would not be property of the estate).

**8.** Notwithstanding the misgivings expressed *supra* notes 6 and 7, this case does not present the necessity of deciding whether earmarking should apply in the absence of a guarantor or, if so, to which transactions the doctrine should extend.

lated facts concede the first two *In re Bohlen Enters., Ltd.* elements (agreement and execution) to the trustee. They can be disposed of with a few swift strokes. The third (diminution) requires a bit of elbow grease.

### A. Agreement

■ AT & T falters on the first element: there was no agreement between MBNA, the new lender, and Adams as to how the funds would be applied. The only "agreement" here was MBNA agent's offer to send blank balance transfer checks to Adams and Adams's agreement to accept them. Moreover, it was Adams who determined whether and how to use the checks: to whom, and in what amount(s), they would be paid. MBNA had no persuasion over her decision. Not only must there be an agreement on the use of funds, but, under such an agreement, "for the earmarking doctrine to apply it must be the new creditor, not the debtor, who stipulates as a condition of the loan that the proceeds be used to pay the pre-existing loan." *In re Spitler,* 213 B.R. at 998 (citing *In re Montgomery* ). *See, e.g., Hansen v. MacDonald Meat Co. (In re Kemp Pacific Fisheries, Inc.),* 16 F.3d 313, 317 (9th Cir.1994)(rejecting an earmarking defense, finding no indication that the new lender

stipulated the payee, now preference defendant, to debtor).[9]

### B. Performance

The second element of the *In re Bohlen Enters., Ltd.* test reemphasizes the failure of this transaction to satisfy the first: there was no agreement to be performed. The only "performance" was Adams's unilateral decision to use the MBNA balance checks to pay off the AT & T account. Hers was not performance under an agreement. In effect, AT & T concedes the point.

### C. Diminution of the Estate

AT & T does address the substance (if not the form) of the third element of the *In re Bohlen Enters., Ltd.* test. Its wayward approach to this element cries out for correction.

"Diminution of the estate" is a construct that is inescapable whatever version of the earmarking doctrine is applied; it plays a large role under the "dominion and control" test and is essential under *In re Bohlen Enters., Ltd..* The divers articulations of the concept and its import can be befuddling, particularly when discussions veer from the concrete to the abstract.[10]

---

9. Even those inclined to apply earmarking expansively concur with this limitation on its scope. *See, e.g., In re Bohlen Enters., Ltd.,* 859 F.2d at 569 (McMillen, J. dissenting) ("If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid independent of the third party whose funds are being used in partial payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer."); *In re Safe–T–Brake of South Florida, Inc.,* 162 B.R. at 365–66 (adopting "dominion and control" test, focusing on the debtor's ability to designate the recipient of the funds and power to disburse the funds). Though the "dominion and control" test, by dispensing with the necessity of demonstrating an agreement and performance of that agreement, invites application of the earmarking doctrine to a wider array of transactions than does *In re Bohlen Enters., Ltd.,* AT & T, we see, could not prevail even under its greater embrace.

10. AT & T is not the first to be confused by the interlacing of the notions of "property of the estate," "diminution of the estate," "an interest of the debtor in property," and the debtor's "dominion and control." The *In re Safe–T–Brake of South Florida, Inc.* court states the relationship thus:

Absent dispositive control, the Debtor never had an interest in the funds transferred to [the old creditor]. Absent an interest in the funds, the property was never part of the Debtor's estate. Absent any loss of property of the Debtor's estate, other creditors were not harmed, and there was no preference under section 547(b).

*In re Safe–T–Brake of South Florida, Inc.,* 162 B.R. at 367. *See also id.* at 366 n. 3 ("[T]he legal theories of 'earmarking' and 'no diminution of the estate' have essentially the same meaning."). The Ninth Circuit, in reaching a result consistent with today's holding, observed cryptically that the " 'diminution of estate' doctrine has been developed to test

Because the "diminution" notion is the limitation on earmarking that makes peace with the objectives of the Bankruptcy Code, some explication in the face of AT & T's obfuscation is worth the trouble. AT & T hypothesizes that if Adams hadn't borrowed the money from MBNA prior to her bankruptcy, the trustee would not be able reach the untapped line of credit for the benefit of the estate. "Since the estate would *not* have an interest in the untapped credit line," it argues, "then it stands to reason that if the credit line is used to pay off a previous and high rate debt, the estate still does *not* have an interest, since the net effect to the estate is the same either way, with the reduced interest rate."

AT & T's perspective confuses "property of the [bankruptcy] estate" with "an interest of the debtor in property" and miscalculates the reach of the preference statute. Although Adams's transfer to AT & T may not have increased her liabilities going into the bankruptcy, it was a transfer of "an interest of [Adams's] in property," and the transfer did dilute her bankruptcy estate. The transfer negatively impacted equal distribution of assets among Adams's creditors. Adams "drew upon funds that [s]he could have used to pay all creditors equitably, and made those funds available to pay [selected] creditors." *In re Getman*, 218 B.R. at 493. *See also In re Montgomery*,

983 F.2d at 1395–96 (coming to a similar conclusion in context of check kiting transactions); *Lingley v. Stuart Shaines, Inc. (In re Acme–Dunham Inc.)*, 50 B.R. 734, 738–39 (D.Me.1985) (when a new creditor advanced a loan to the debtor meant to pay off an old creditor the effect of the transaction was to diminish the estate, decreasing the sum available for other unsecured creditors); *In re Spitler*, 213 B.R. at 998–99 (rejecting defendant's argument that a convenience check transfer resulted only in a mere "shifting the debt" from one creditor to another, concluding that the transferred sum should "be returned to the bankruptcy estate for a more equitable distribution"); *Howdeshell of Fort Myers v. DunhamBush, Inc. (In re Howdeshell of Fort Myers)*, 55 B.R. 470, 474 (Bankr. M.D.Fla.1985)("If the Debtor determines the disposition of the funds and designates the creditor to whom payment is made, it is clear that the funds are available for payment to creditors in general, and the funds are an asset of the estate."). *Contra In re Safe–T–Brake of South Florida, Inc.*, 162 B.R. at 364 ("[The] caselaw has come to recognize that regardless of the lender's prior relationship with the debtor, or lack thereof, replacing one creditor with another of equal priority does not diminish the estate and thus no voidable preference results.")[11]

whether a debtor controlled transferred property to the extent that he owned it." *In re Kemp Pacific Fisheries, Inc.*, 16 F.3d at 316 (debtor's payment of antecedent debt was a preferential transfer, notwithstanding the fact that payment was made by a check (honored by the drawee) drawn against an overdrawn account; instance in which the debtor controlled who was paid, even though it did not control, or even have an enforceable right to, the funds disbursed).

**11.** Overlooking the pool of similarly situated unsecured creditors in the Adams bankruptcy, AT & T states in its brief that the court ought to consider the practice of "experienced [credit card] creditors," like AT & T and MBNA, of taking a "calculated risk in extending credit to a debtor on the brink of bankruptcy." It describes the new creditor's loss and the old creditor's gain as the "normal

and equitable result between two experienced creditor[s]." The argument takes the notion of "intent of the parties" to places it simply does not belong.

Preference defendants often argue that the intent of the debtor and the new creditor to substitute the new creditor for the old should control the earmarking determination, even if the intent wasn't realized and the debtor applied the funds to a different debt or acquisition. The argument is unconvincing. To begin, it flies in the face of the second *In re Bohlen Enters., Ltd.* prong requiring *performance* of the agreement. It exalts form over substance. And substance, the substance of the bankruptcy estate, is what the Code's preference provisions are all about. *See In re Acme–Dunham Inc.*, 50 B.R. at 738–39 ("In consideration of an alleged preference under section 547, intent or motive is not a material

In sum, to extend the common law earmarking doctrine to the case before me would turn the Code's preference provision's principal objective of orderly and equal distribution on its head—and frustrate express statutory directive. The only party aided by such an extension would be AT & T, who had "nothing to do with the [alleged] earmarking of the funds, and who, in equity, deserves no such benefit." *In re Bohlen Enters., Ltd.*, 859 F.2d at 566. *Accord In re Getman*, 218 B.R. at 493.

Adams's payment to AT & T was not an earmarked transaction. It was a transfer of "an interest of the debtor in property" within the meaning of § 547(b). The trustee is entitled to recover $3956.80 from AT & T.

A separate order shall issue forthwith.

factor," it is the effect on the estate); *see e.g., In re Bohlen Enters. Ltd.*, 859 F.2d at 567 (no earmarking defense, though the new creditor and the debtor had agreed the funds would be used to pay-off the old creditor, the debtor contravened the agreement and used them for its own purposes, concluding that the rogue act demonstrated the debtor's control over the funds, dismissing the relevance of the parties' intent).

If the intentions of the debtor and the new creditor are irrelevant, the supposed intent (or industry assumptions) between or affecting the old and new creditors is doubly so. The trustee's ability to avoid preferences such as the one before me does not provide a "windfall for the other creditors," at the recipient's expense, as AT & T argues. Rather, it prevents creditors on the receiving end of the eve-of-bankruptcy transfers from walking away with more than their (statutorily-defined) fair share.