In the Matter of David Gordon GRAVES and Karen Ann Graves, Debtor.

Frank H. LANG, Jr., as Trustee of the Estate of David Gordon Graves and Karen Ann Graves, Appellant,

v.

ADVANCE LOAN COMPANY, Appellee.

Bankruptcy No. 181–01058.

CV F 84–121–EDP.

United States District Court, E.D. California.

Jan. 8, 1985.

Michael Terry Hertz, Fullerton, Lang, Richert & Patch, Fresno, Cal., for appellant.

James M. Hurley, McCormick, Barstow, Sheppard, Wayte & Carruth, Fresno, Cal., for appellee.

## MEMORANDUM DECISION

PRICE, District Judge.

This matter reached this Court on an appeal from the decision of the Bankruptcy Court. The matter was tried to the Bankruptcy Court pursuant to a stipulation of fact. The stipulation is as follows:

1. This case was commenced by the filing of a voluntary petition under Chapter 7 of Title 11, United States Code, in this Court by David Gordon Graves and Karen Ann Graves ("Debtors") on May 1, 1981.

2. Among the property of the estate is a residence located at 19107 Diablo, Madera, California 93637 (the "Property"). Debtors claimed this Property as exempt.

3. On October 29, 1981, Trustee filed in this Court on behalf of Advance Loan

a secured claim in the amount of $111,-585.11, based upon a Deed of Trust on the Property. A copy of said Proof of Claim is attached hereto as Exhibit "A". A copy of Advance Loan's Deed of Trust is attached hereto as Exhibit "B", and a copy of the Note underlying said Deed of Trust is attached hereto as Exhibit "C". On October 29, 1981 there was filed in this Court Trustee's objection to the allowance of the claim of Advance Loan. A copy of this objection as amended by stipulation between the parties, is attached hereto as Exhibit "D".

4. *In late 1979, Advance Loan made loan numbers 11651 and 11652 to debtor, David G. Graves, by rewriting pre-existing loans to him. On January 22, 1981, these two loans were rewritten under loan number 12091 in the principal sum of $111,661.62, which was documented by the Note set forth in Exhibit "C" and secured by the deed of Trust set forth in Exhibit "B".* The deed of trust underlying the consolidated loans were then released by Advance Loan, and those releases were recorded. Payments of $1,235.00 each were made by the Debtors to Advance Loan on February 27, March 27, and April 27, 1981, which checks respectively cleared Debtors' bank on March 2, April 2, and May 7, 1981. Copies of those checks are set forth in Exhibit "E". (emphasis added)

Advance Loan had two appraisals done on the Property, one of which showed a value of $102,500.00, and the second of which showed a value of $106,000.00. Those appraisals are set forth in Exhibits "F" and "G". In addition to the security represented by the Property, Advance Loan had security in the form of ten items of consumer goods, which the parties hereto agree were worth less than $2,500.00 at the time the three payments in question were made. The parties hereto agree that the total value of the Property and the consumer goods which were collateral for Advance Loan were less than $107,500.00 at all times. The principal balance due under the Note prior to the filing of the petition herein was never less than $111,585.11. A monthly payment sheet on Debtor's loan is set forth as Exhibit "H".

5. Debtors' bankruptcy petition shows no non-exempt unsecured assets, secured claims of $168,924.46, and unsecured claims of $5,518.33.

6. The Debtors in their petition did not purport to exempt the sum of $1,235.00 which cleared their bank account on May 7, 1981.

7. At no time were or are the Debtors in default on the loan from Advance Loan, and the Debtors are and have been making all their usual and regular payments according to the terms of the Note.

8. The issues to be determined by the Court are as follows:

A. Were the three payments of $1,235.00 each made by the Debtors to Advance Loan preferential under § 547 of the Bankruptcy Code and recoverable by the Trustee under § 550 of the Code?

B. Was the payment of $1,235.00 made by the Debtors to Advance Loan on May 2, 1981 avoidable under § 549 of the Code and recoverable by the Trustee under § 550 of the Code?

C. The Court shall also determine all other issues, including subissues of Paragraphs A and B above, raised by the facts herein to which the parties hereto have stipulated.

After considering the respective arguments of counsel for the respective parties, the Bankruptcy Judge here made the following findings in his 18-page opinion:

1. The loan which forms the basis of the claim by Advance Loan was made and the interest first began to accrue on January 16, 1981.

2. The first payment in issue here was made by check on February 27, 1981.

3. The second payment was made by check on March 27, 1981. This payment was made for interest that began to accrue on February 16, 1981.

4. The third payment was made by check on April 27, 1981, for interest that began to accrue on March 16, 1981.

From the foregoing factual findings, the Bankruptcy Court made the following conclusions of law:

The trustee may not recover any part of the three payments:

(1) The first payment was made within 45 days after the debtor first became legally obligated to pay, so even under *Barash* [1] the trustee could not recover any of it.

(2) Because all but $51.28 of the last two payments was interest that the debtor was not legally bound to pay until it accrued, under the rule of *Iowa Premium Services,* [2] the trustee may not avoid any amount of the last two payments except the $51.28 credited to the unsecured balance of the principal, and

(3) The trustee may not recover even the $51.28 because of the constitutional and equitable considerations set forth herein and because the amount is *de minimus.*

The constitutional issues referred to in the foregoing in the Bankruptcy Judge's learned dissertation begin with the proposition that the bankruptcy power of Congress is subject to the Fifth Amendment prohibition against taking private property without compensation. By analogy to the cases upholding the critical portion of the Bankruptcy Judge's opinion in this regard is found in the following segment:

Holding normal installment payments on undersecured loans to be preferences recoverable by the trustee may result in an unconstitutional taking of the following property rights:

1. The creditor's right to foreclose at a time when 90 days depreciation has not eroded the amount of his security interest.

2. The creditor's right to control the security during the default. Indeed, the

creditor did not know of the default until the trustee had attempted to recover the payments.

3. The debtor's right to remain in possession of the property by keeping his payments current. See *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. [555, 55 S.Ct. 854, 79 L.Ed. 1593] (1935) for a similar characterization of property rights. The Supreme Court's "two factual foci for taking determination: '[1] the economic impact of the regulation, its interference with reasonable investment-backed expectations and [2] the character of the governmental action;' " *Matter of Gifford,* 688 F.2d 447, 455 (7th Cir.1982), arguably are impinged here.

The equitable considerations referred to by the Bankruptcy Judge are addressed in his consideration of the practical effects of the *Barash* holding, if carried to their ultimate logical conclusion. As stated by the Bankruptcy Judge, in the great majority of bankruptcy cases, the designation of ordinary consumer credit transactions as preferences does not benefit the unsecured creditors as intended by Congress, but rather, the trustee and his attorney.

After filing his findings of fact and conclusions of law, the Bankruptcy Judge entered judgment, which provided in material part:

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED that the Trustee's objection to allowance of Claim No. 8, as amended, is overruled and that said claim will be allowed as filed, and that the Trustee may not recover from the Claimant ADVANCE LOAN COMPANY any payments made to said claimant by the Debtors prior to the commencement of this bankruptcy case.

The Trustee filed a timely notice of appeal from this judgment.

Since the parties have stipulated to the facts upon which the Bankruptcy Judge's

---

**1.** Counsel for both sides rely principally on two cases. The first is *Barash v. Public Finance Corp.,* 658 F.2d 504 (7th Cir.1981). That case will be referred to hereinafter as *"Barash".*

**2.** The second case relied on by counsel is *In Re Iowa Premium Service, Inc.,* 695 F.2d 1109 (8th Cir.1982). That case will be hereinafter referred to as *"Iowa Premium II".*

decision is based, we review the decision of the bankruptcy court for errors of law.

The lengthy, well considered opinion of the Bankruptcy Court clearly indicates that the Trustee's position in this case may be summarized as follows:

1. The claimant, Advance Loan Company, received three monthly payments of $1,235.00 each within three months of the filing of the bankruptcy by the bankrupts. After the bankruptcy proceedings were filed, the claimant Advance Loan Company refused to turn over these sums to the Trustee. The Trustee requests the Court to simply order the claimant loan company to turn over to the Trustee the three payments of $1,235.00 each, as preferences. It should be noted that although it was not contained in the written stipulation, counsel for both parties were in agreement at oral argument that substantial portions of the three payments in question were credited to interest.

2. The Trustee also requested the Court to disallow the claim of Advance Loan Company in its entirety because of the acceptance of the preference.

The Trustee rests his contention that the payments in question were preferences upon the provisions of 11 U.S.C. § 547(b), which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title [11 USC §§ 701 et seq.];

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title [11 USC §§ 1, et seq.].

One cannot adequately test the trustee's powers under the preceding section, however, unless it is read in conjunction with 11 U.S.C. § 547(c), which provides, in pertinent part, as follows:

(c) The trustee may not avoid under this section a transfer—

.    .    .    .    .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms;

As previously stated, counsel for both parties principally rely upon two cases in making their legal arguments, first before the bankruptcy court, and later here, on appeal. As may be expected, they draw conflicting inferences from each case.

The inferences urged upon the Court by the Trustee are based upon *Barash*. The operative facts of the *Barash* case are lucidly set forth:

In each of the eight cases regular installment payments were made to a creditor within 90 days of an order for relief, 11 U.S.C. § 301. In each case the value

of the creditor's collateral was less than the debt it secured. In all but one case, however, the value of the collateral exceeded the amount of the payments made during the 90-day period preceding bankruptcy. All of the payments in question were voluntary, some made through automatic payroll deductions, others by direct payment from the debtor. The bankruptcy court found that none of the payments were made to cure defaults or eliminate arrearages. All of the accounts in question were considered current.

*Barash v. Public Finance Corp.*, 658 F.2d 504, 505–506.

In a footnote to this recitation, it appears that all of the secured obligations in question were secured by household goods, furniture and/or automobiles. The footnote also indicates that each loan in question was made a short time before bankruptcy proceedings started, and that each debtor received the entire loan proceed for his own use. The opinion does not indicate that the loans were a result of any previous commercial relationship between the debtor and the secured creditor, or that such a relationship existed.

The *Barash* court, after analyzing the elements of the preferences set forth in § 547(b), *supra*, next considered the relationship between that section and 11 U.S.C. § 506(a).[3] The *Barash* court pointed out that for the first time, the bankruptcy law mandates the categorization of claims as well as categorization of creditors, and to the extent that debt owed to a creditor exceeds the value of the collateral allocated to secure that debt, that creditor becomes both a secured and unsecured creditor. This, in turn, directly impinges upon the fifth element of preference, namely, the inquiry that the court must make to determine whether the creditor involved, by retaining the payment claimed to be a preference will "receive more than he would receive if the estate were liquidated under Chapter 7."

Specifically, the *Barash* court reasoned that:

Section 547(b)(5) is directed at transfers which *enable* creditors to receive more than they would have received had the estate been liquidated and the disputed transfer not been made. As long as the transfers diminish the bankrupt's estate available for distribution, creditors who are allowed to keep transfers would be enabled to receive more than their share. The creditors in the instant case must account for the payments they received during the 90 days preceding the bankruptcy filing, or they will ultimately receive a larger share of their *unsecured* claims than other unsecured creditors. Of course, they will still receive the full benefit of their collateral as to their secured claims.

*Barash v. Public Finance Corp., supra*, at 509.

After demonstrating this relationship, the Court turned to the consideration of § 547(c)(2), which exempts the bankruptcy transfers from being a preference if the transfer was made in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee, and was not made later than 45 days after the debt was incurred. Further exempted are transfers made in the ordinary course of business or financial affairs of the debtor and the transferee and transfer is made according to ordinary business terms. The *Barash* court conceded that the obligations before them clearly met all of the required criteria to be exempt except whether the payments in question were

---

**3.** 11 U.S.C. § 506(a) reads as follows: An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title [11 U.S.C. § 553], is a secured claim to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the values of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

made within 45 days after the debts were "incurred." After discussing the importance of Congress having eliminated the intent or motive of the bankrupt in making three bankruptcy payments,[4] the *Barash* court concluded that a debt is incurred when it becomes a legally binding obligation of the debtor, *i.e.*, when the original debt is incurred, not when the monthly or other periodic installments fall due.

The *Barash* court concluded that Congress intended that:

In short, the § 547(c)(2) exception is aimed at transactions which, although they are technically credit transactions, are not intended to remain unpaid for a long time. In this sense, the "normal payments" exception is a variant of the "contemporaneous exchange" exception of 547(c)(1).

*Barash v. Public Finance Corp., supra,* at 511.

After this exhaustive analysis, the *Barash* court concluded that:

We hold that regular installment payments on consumer debts, made within 90 days preceding the filing of a bankruptcy petition, may be avoided as preferential transfers to the extent the payments are credited to unsecured claims. The bankruptcy court must determine the value of collateral on a case-by-case basis to ascertain the extent of the preferences, in keeping with the bifurcation of debts into secured and unsecured claims under 11 U.S.C. § 506(a). The exception for normal transactions in 11 U.S.C. § 547(c)(2) extends only to situations where payment is made within 45 days after the debtor first becomes legally bound to pay.[5]

*Barash v. Public Finance Corp., supra,* at 512.

The *Barash* analysis was adopted by an Eighth Circuit panel in *In Re Iowa Premi-*

um *Service Co., Inc.,* 676 F.2d 1220 (8th Cir.1982)[6] with regard to monthly interest payments on an unsecured promissory note.

However, after the above decision was released for publication, the Eighth Circuit granted a hearing *en banc*. After reargument on the hearing *en banc*, the Eighth Circuit by a five to three decision, reversed the original panel, *In Re Iowa Premium Service Co., Inc.,* 695 F.2d 1109 (8th Cir. 1982).[7]

*Iowa Premium II* agreed with the *Barash* panel and the panel in *Iowa Premium I*, that the obligation of the debtor to *repay the principal* of the obligation in each case, was the date upon which the consideration for the debt was received or alternately the execution of the instrument evidencing the debt. Since the payments in issue before the Court were for interest only, the majority in *Iowa Premium II, supra,* at 1111–1122, concluded that:

There can be no doubt that IPSCO was not legally bound to pay interest when the note was executed; it had no obligation to pay interest until it used the money. IPSCO can be compared to a tenant who leases property; the tenant pays for the continued use of the property, not just for taking possession. Interest is simply rent for the use of money. IPSCO can also be compared to a customer of an electric utility. The customer agrees to pay for whatever electricity it uses, but the debt to the utility is not incurred until the resource is consumed. A customer does not incur a debt when it makes the original agreement with the utility. Likewise, IPSCO agreed to pay interest for the use it made of the money, but the debt was not incurred until IPSCO actually used the money.

---

4. This discussion, of course, referred to the former section 60 of the Bankruptcy Act of 1898, and its progeny.

5. The *Barash* court does not tell us, thus we assume that the loans there in question were not part of an ongoing commercial relationship.

6. Hereafter *"Iowa Premium I".*

7. Heretofore *"Iowa Premium II".*

The foregoing analysis would appear to be sound when applied to the facts of the case before the Eighth Circuit. A reading of the factual recitation contained in both *In Re Iowa Premium* cases would indicate that the note in question contained no provisions for prepayment penalty, and hence the debtor-maker of the note could satisfy the obligation by prepaying the principal plus the accrued interest to date at any time.

The narrow thrust of *Iowa Premium II* must be understood—it merely holds that on the particular facts before it, the periodic interest payments were not preferences. It must be concluded, therefore, that the holding in *Iowa Premium II* must be limited to the peculiar facts with which that court was dealing, and would not be authority for any case that did not present identical facts. Further, it should be noted that the *Barash* panel never discussed the credit terms that had been extended to the appellee-bankrupts, and hence we do not know whether the funds sought by the Trustee were all interest or all principal, or both.[8]

The majority panel in *Iowa Premium II*, as did the bankruptcy judge in the case presently before the Court, relied heavily upon the following excerpt from the House Judiciary Committee reporting on § 547 of the Code:

The second exception protects ordinary course of business (or financial affairs, where a business is not involved) trans-

fers. For the case of a consumer, the paragraph uses the phrase "financial affairs" to include such nonbusiness activities as payment of monthly utility bills. If the debt on account of which the transfer was made was incurred in the ordinary course of both the debtor and the transferee, if the transfer was made not later than 45 days after the debt was incurred, if the transfer itself was made in the ordinary course of both the debtor and the transferee, and if the transfer was made according to ordinary business terms, then the transfer is protected. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.[9]

Unfortunately, much was said by many people during the debate on The Bankruptcy Act of 1978, and counsel for both parties in this case have quoted extensively from those debates and other portions of the committee report which they contend aid their position. In fairness, the excerpted portions relied upon do support their contention, however, it is difficult to understand the exact meaning and intent of the quoted portion because, as was pointed out by the *Barash* court, the bankrupt's state of mind is no longer material in determining whether or not a particular transfer is, in fact, preference.[10]

---

**8.** The *Bankruptcy Judge* found that all but $51.28 of the last two payments made by the bankrupts in the case before the Court was payment of principal.

**9.** The Senate focus is essentially the same. The Senate Report states:

The second exception protects transfers in the ordinary course of business (or of financial affairs, where a business is not involved) transfers. For the case of a consumer, the paragraph uses the phrase "financial affairs" to include such nonbusiness activities as payment of monthly utility bills. If the debt on account of which the transfer was made was incurred in the ordinary course of both the debtor and the transferee, if the transfer was made not later than 45 days after the debt was

incurred, if the transfer itself was made in the ordinary course of both the debtor and the transferee, and if the transfer was made according to ordinary business terms, then the transfer is protected. The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

Senate Report, Legislative History, Bankruptcy Reform Act of 1978, 5 *U.S. Code Cong. & Admin. News* 5787, 5874.

**10.** In an appeal from a decision of the Bankruptcy Court, construing the pre-1978 Act, the following illustrates the difference between the two approaches:

It apparently was this type of factual finding that Congress intended to dispense with.

The Court does not necessarily disagree with the Bankruptcy Judge's observation concerning the constitutional considerations that may be involved in the appellant's position or, conversely, with the practical effects of that position. The Court feels, however, it is not necessary to reach those considerations.

Neither does the Court feel that an in depth analysis of when the debt was "incurred" is a useful analysis to be employed in each individual case, although it may be necessary as a subordinate analysis after the principal analysis is made, *i.e.,* whether a preference in fact existed.

The focus, the Court believes, should rather be upon a reconciliation of 11 U.S.C. § 547(b) and 11 U.S.C. 547(c). It is within these subsections that the conflict in Congressional intent occurs. When Congressional conflict becomes apparent, it becomes the duty of the Court to attempt a reconciliation that will most closely conform to perceived Congressional intent. In so doing, it might be useful to test a transaction against the exemption provisions of 547(c) after applying the criteria of 547(b). Such a procedure, the Court feels, would more reasonably serve the announced purpose of Congress.

In conclusion, it would appear that when confronted with a preference problem of the type presented here and in the circuit court cases that have considered the problem, the court's focus must be on the past relationship of the parties. If there is an ongoing creditor-debtor relationship, it would appear that the intent of Congress would be to exempt the payments to the secured creditor if, as here, the loan, although made shortly before bankruptcy, was the result of a preceding commercial relationship that arose in the ordinary course of business, and beyond the time that it might be assumed that the debtor was engaged in pre-bankruptcy planning.

Frankly, the Court is not convinced that, as a policy matter, the newly created scheme for determining what is or is not a preference is an improvement over the pre-1978 system which focused on the debtor's state of mind. However, that is an area that Congress must explore, and, if appropriate, address it.

For all of the foregoing reasons, the judgment of the Bankruptcy Court is affirmed.

---

Referee Gillard found that the series of transactions between June 14, 1968 and July 12, 1968, whereby the assets of Bankrupt were transferred to Titus and his companies, were fraudulent, within the meaning of all four subsections of § 67d(2) of the Bankruptcy Act, 11 U.S.C. § 107(d)(2). Specifically, the bankruptcy court found that the transfers, which were performed within the statutory limit of one year prior to the filing of the creditors' bankruptcy petition, were made without fair consideration by an insolvent and with actual intent to hinder, delay or defraud the creditors of Bankrupt. Thus, the referee found both actual and constructive fraud on the part of the Bankrupt and the appellants. To uphold the judgment voiding the transfers as fraudulent, it is only necessary to find *either* that there was no fair consideration given and Bankrupt was or was thereby rendered insolvent; *or,* that there was actual intent to hinder, delay or defraud creditors. 4 Collier on Bankruptcy, ¶ 67.34[3]. *Matter of Christian & Porter Aluminum Co.,* 584 F.2d 326, 335 (9th Cir.1978).