**In re RDC CORPORATION, Debtor.**

**William G. McCLANAHAN, Trustee, Plaintiff,**

**v.**

**LAKESIDE NATIONAL BANK OF LAKE CHARLES, Defendant.**

**Bankruptcy No. 485–00253–LC–7. Adv. No. 486–0094.**

United States Bankruptcy Court, W.D. Louisiana.

March 22, 1988.

William McClanahan, Trustee.

Ronald Bertrand, Lake Charles, La., for trustee.

Stephen Polito, Lake Charles, La., for Lakeside Nat. Bank.

## OPINION

W. DONALD BOE, Jr., Bankruptcy Judge.

The complaint of the trustee, William G. McClanahan, seeks to avoid two preferential payments by the debtor to defendant, Lakeside National Bank. Defendant agrees that the payments were preferential transfers described in Bankruptcy Code section 547(b), but maintains that the transfers were immune from the trustee's avoidance powers under section 547(c)(2) as payments in the "ordinary course of business."

The Court has considered the stipulations of counsel, the evidence adduced at trial, and the memoranda and arguments of counsel. In accordance with Federal Rules of Civil Procedure, Rule 52(a) (applicable to this proceeding by Bankruptcy Rule 7052), the Court now issues its findings of fact and conclusions of law.

## FINDINGS OF FACT

The debtor, RDC Corporation, filed for relief under Chapter 11 of the Bankruptcy Code on March 5, 1985. The case was

subsequently converted to a case under Chapter 7.

The debtor was in the business of general contracting for industrial construction; the defendant, its bank. During the two years the debtor was in business, the bank made two start-up loans, a car loan, and thirty-two working capital loans to the debtor based on a percentage of invoices billed by the debtor on its jobs. The invoices were not security for the loans, but the bank considered them when making loans and, at the time, thought it could rely on them for repayment.

Lakeside had been lending to the debtor for about a year when the two promissory notes and loans in question were made. The first note was dated June 8, 1984, in the original principal sum of $10,000, payable ninety (90) days from date. The second note was dated July 2, 1984, in the original principal amount of $10,000, payable ninety (90) days from date. The principal debts of $10,000 were paid down to about $5,000 each and renewed at the reduced principal amounts in August 1984, well in advance of their maturity dates.

During the two years of the debtor's business, the bank extended the terms of three of thirty-two notes because RDC had failed to receive payment on the invoices, either because of arrearages or disputes.[1] The two notes and loans in question were the only ones renewed well in advance of their maturity dates; additionally, they were the only ones renewed as a result of having been reduced. As renewed, the notes' maturity dates were November 8 and December 18, 1984. Considering the renewed maturities, the two December 19 payments were late by 42 days and by 1 day, respectively. These two payments were the only ones made later than the extended maturity dates of the corresponding notes date during the bank's course of dealings with the debtor.

The two notes were based on disputed Conoco invoices. When the bank became aware of the dispute, it wanted an undisputed and (in its view) more collectible invoice "substituted as collateral." On these two notes only, the debtor provided substitute invoices to the bank. Payment was eventually made to the debtor under the substituted invoices, and thereafter to the bank during the preference period.

Defendant Lakeside received payment by two checks dated December 19, 1984, in the amounts of $5,186.98 and $5,260.21, fully satisfying the remaining balances on the two promissory notes. The checks were transferred to the defendant within 90 days before the debtor filed for relief (on March 5, 1985), and enabled defendant to receive more from the debtor than would have been allowed in Chapter 7 if the payments had not been made.

## CONCLUSIONS OF LAW

The payments of $5,186.98 and $5,260.21 to defendant during the preference period on account of antecedent debts constitute preferential transfers described in Bankruptcy Code section 547(b)(1)–(5). The trustee may avoid the transfers as preferential unless they are excepted by one or more of the provisions of subsection (c) of Bankruptcy Code section 547. 11 U.S.C. sec. 547(b).

A trustee could not avoid these transfers to the extent they were a) in payment of a debt incurred by the debtor in the ordinary course of business of the debtor and the bank; b) made in the ordinary course of business of the debtor and the bank; and c) made according to ordinary business terms. 11 U.S.C. sec. 547(c)(2). The Code does not define these phrases.

The transfers were doubtless in payment of a debt incurred in the ordinary course of business of the creditor bank: a bank's regular course of business involves many types of loans. Whether the debt was incurred in the ordinary course of business of the debtor is a closer question.

To appreciate the extent of the ordinary course of business exception, it is useful to look at the purpose and history of the exception. Prior to the Bankruptcy Amendment and Federal Judgeship Act

---

1. The bank also extended the two notes representing the indebtedness on the initial start up loans at their approximate maturities.

("BAFJA"), the ordinary course of business defense under section 547(c)(2) required that the debtor's payment to the creditor be made within 45 days after the debt was incurred. Forty-five days was selected as a normal "trade credit" cycle. *See* Levin, *An Introduction to the Trustee's Avoiding Powers,* 53 Am.Bankr.L.J. 173, 186 (1979).

Pre–BAFJA cases viewed the defense as one for short-term credit transactions kept current by the debtor. *See e.g., Barash v. Public Finance Corp.,* 658 F.2d 504, 511, 4 C.B.C.2d 1548, 7 B.C.D. 1438 (7th Cir.1981), *citing* Levin; *Evans Temple v. Carnegie Body Co. (In re Evans Temple),* 55 B.R. 976, 984 (Bankr.N.D.Oh.1986) (the exception is for "normal credit transactions such as the sale of goods from a business supplier on account or the payment of monthly utility bills"); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1567, 14 B.C.D. 553, Bankr.L.Rep. para. 71,081 (11th Cir.1986) (exception is for ordinary trade credit transactions, typically involving some extension of credit, but meant to be paid in full within a single billing cycle); and *Aguillard v. Bank of Lafayette, (In re Bourgeois ),* 58 B.R. 657, 659, Bankr.L.Rep. para. 71,054 (Bankr.W.D.La.1986) (payments for goods, utilities, rent, or services, and payments to employees and suppliers, and other similar operating expenses or trade credit transactions are within the exception).

Enactment of the ordinary course of business exception in section 547(c)(2) of the 1978 Bankruptcy Code was also seen as a complement or near-equivalent to the "contemporaneous exchange" exception in section 547(c)(1). *See Bourgeois,* 58 B.R. at 659 and 660; and *Barash,* 658 F.2d at 511. Payments made within the 45–day trade credit cycle were so close to "contemporaneous" that they were not to be treated as payments on "antecedent" debts.

Earlier, under the old Bankruptcy Act, there was no ordinary course of business exception; there was instead a judicially created "current expense" rule insulating regular business expenses paid to creditors by the debtor. The rationale for both the "current expense" rule and for the section 547(c)(2) exception is the same: payment does not diminish the estate, is not for an antecedent debt, and allows the debtor to stay in business. *See* Kaye, *Preference under the New Bankruptcy Code,* 54 Am. Bankr.L.J. 197, 201–02 (1980); *Barash,* 658 F.2d at 511; *Craig Oil,* 785 F.2d at 1567 ("the foundation of this provision is the similarity of trade credit and current expenses"); and *Lingley v. Stuart Shaines, Inc. (In re Acme–Dunham Inc.),* 50 B.R. 734, 740–41 (D.Me.1985).

Under pre-BAFJA law the ordinary course of business exception, although directed to credit transactions, was not intended for credit transactions that would remain unpaid for a long time. The *Lingley* court points out the difference between a short-term transaction with a trade creditor, which is protected by 547(c)(2), and a longer term loan, which does not further the policy of the "ordinary course" exception:

> This Court sees a marked difference between a long-term loan and the ordinary credit transactions protected by section 547(c)(2). Trade credit transactions are exactly that—a two-way exchange. They further the policies of the Code because they allow the debtor to continue on in business and in the narrow context of ongoing trade exchange, they do not diminish the estate for it is replenished by the goods or services paid for. A long-term loan is an antecedent debt in the traditional sense. The monthly payments of interest do not represent ongoing trade transactions because the decision to pay them was made far in advance of the payment (at the time the loan was negotiated) and in fact nothing is exchanged at the time of the payments with the debtor which helps him to continue in business. There is merely an outflow of money from the estate.

*Lingley,* 50 B.R. at 741–42. *Accord, Wickham v. United American Bank (In re Property Leasing & Management, Inc.),* 46 B.R. 903, 914, 12 C.B.C. 2d 410 (Bankr. E.D.Tn.1985).

The question in the case at hand is whether BAFJA'S elimination of the 45-day rule extends the protection of section 547(c)(2) from ordinary short-term trade creditors to a ninety-day note whose maturity was extended several months. This Court has previously held that this amendment was intended only to eliminate an artificial time limit, and not to change fundamentally the scope of the ordinary course exception. *In re Bourgeois*, 58 B.R. at 659–60. A leading bankruptcy treatise advises that present Code section 547(c)(2) protects only "recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor". 4 *Collier on Bankruptcy* para. 547.-10 (15th ed. 1987).

As with contemporaneous exchanges, a "basic equilibrium" is maintained when goods or services are obtained and paid for in the normal trade credit cycle. *Property Leasing*, 46 B.R. at 914. Leaving undisturbed such normal trade credit transactions furthers the purpose of the ordinary course of business exception and the policy of the Code's avoidance provisions to insure equal distribution. *See Bourgeois*, 58 B.R. at 660.

Long-term loans certainly are not similar to contemporaneous exchange, but are rather "a form of capitalization which is not generally part of the debtor's day-to-day business activities.... 'Ordinary course' refers to the debtor's normal business operations of selling goods or providing services, not borrowing money." *Bourgeois*, 58 B.R. at 660. *See also Carter v. Pickens (In re Arctic Air Conditioning, Inc.,* 35 B.R. 107 (Bankr.E.D.Tn.1983) (a loan to forestall IRS asset attachment and to be repaid after a short time upon completion of work in progress is not a debt "incurred" in the ordinary course of business of corporate debtor). Even if the loan is made to meet current expenses, it may not be "incurred" in the ordinary course of business of the debtor:

> The proof in this case established that in connecting its pipe line construction business the debtor would require fairly large amounts of capital in order to obtain job bids and in order to cover overhead expenses between the time a job began and the time payment was received for that particular job.... Although these transactions occurred with some frequency during a six-month period ... they were *not transactions within the normal operation of the debtor's business.* These short-term loans were made by the defendant to the debtor in order to allow the debtor to maintain operations despite its capitalization problems. Such transactions are not excepted from avoidance under the "ordinary course of business" exception found within section 547(c)(2).

*Waldschmidt v. Ranier (In re Fulghum Construction Corp.),* 45 B.R. 112, 116, 11 C.B.C.2d 1378, 1382–83 (Bankr.M.D.Tn. 1984) (emphasis added) *aff'd,* 78 B.R. 146 (M.D.Tn.1987).[2] Repayment of a working capital loan clearly diminishes the estate and upsets the "equilibrium". The resulting diminution of the estate without a commensurate benefit contradicts the preference section's fundamental policy of equality of distribution. *See Property Leasing,* 46 B.R. at 914.

■ The obligations at issue in the present case cannot be characterized as operating expense or "trade credit" transactions akin to a substantially contemporaneous exchange. The obligations were extraordinary and the payments thereon were on account of antecedent debts. Thus the transfers were not in payment of debts *"incurred"* in the ordinary course of the debtor's business under section 547(c)(2)(A).

That the transfers be *"made"* in the ordinary course of business of the debtor and the bank is further required by section 547(c)(2)(B). Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception. Untimely payments are likely to be considered outside the ordinary course of business and avoidable. *In re Craig Oil,* 785 F.2d at 1567–68. In

---

**2.** *Cf. Lang v. Advance Loan Co. (In re Graves),* 45 B.R. 858 (E.D.Cal.1985), relied on by defendant. *Graves* involved monthly installments and not retirement of notes as in this case.

the case at bar the challenged transfers were the only two payments made following the original maturity date; moreover, they were not even within the extended terms of the notes. They were not in the ordinary course of business.

 Further, the evidence revealed other deviations from the normal payment pattern. The notes were extended and renewed when·partial payment was made, rather than simply credited with the amount of payment; they were renewed well in advance of their maturities; and they were the only notes for which the debtor provided substitute invoices. The legislative history reflects that "The purpose of this exception is to leave undisturbed *normal* financial relations, because it does not detract from the general policy of the preference section to discourage *unusual action* by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. no. 595, 95th Cong., 1st. Sess. 373, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6329 (emphasis added). "Unusual actions by parties to collect or pay existing debts are proscribed." *In re Bourgeois,* 58 B.R. at 660. Because the payments on the two notes in question deviated from the norm in several particulars, the Court holds that the payments were made outside the "ordinary course of business of the debtor and the transferee". 11 U.S.C. sec. 547(c)(2)(B).

The Court makes no finding with respect to section 547(c)(2)(C). Because the three requirements in section 547(c)(2)(A), (B), and (C) are *conjunctive*, the Court need not determine whether the transfers were "made according to ordinary business terms." The failure of the transfers to meet the requirements in section 547(c)(2)(A) and (B) suffices to remove them from the protection of that exception.

The transfers neither paid debts incurred in the ordinary course of business of the debtor, nor were they made in the ordinary course of business of the debtor and the transferee. 11 U.S.C. sec. 547(c)(2)(A) and (B). For each of these reasons neither transfer was within the "ordinary course of business" exception to the trustee's avoid-ance powers in Code section 547(c)(2). The trustee may recover, for the benefit of the estate, the amount of the transfers to the bank totalling $10,447.19.

A Judgment is being entered contemporaneously with this Opinion.