In the Matter of CHG
INTERNATIONAL,
INC., Debtor.

CHG INTERNATIONAL, INC.,
Plaintiff–Appellant,

v.

BARCLAYS BANK, Defendant–Appellee.

No. 88–3889.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1989.

Decided Feb. 28, 1990.

John J. Mitchell, Lane Powell Moss & Miller, Seattle, Wash., for plaintiff-appellant.

Mark D. Northrup, Graham & Dunn, Seattle, Wash., for defendant-appellee.

Before BROWNING, ALARCON and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Debtor-appellant CHG International, Inc. ("CHG") appeals from the district court's grant of summary judgment to creditor-appellee Barclays Bank PLC ("Barclays") on the issue of whether CHG could recover as preferential transfers two interest payments it made to Barclays on undersecured loans within 90 days of the filing of CHG's Chapter 11 bankruptcy petition. CHG argues that the district court (1) should have found that Congress did not intend the "ordinary course of business" exception in 11 U.S.C. § 547(c) to except payments on long-term debt from avoidance as preferential transfers under 11 U.S.C. § 547(b); (2) erred in finding that under Washington law the debt accrued when interest payments were due and not when the loan was signed; and (3) erred in concluding that Barclays had met its burden under Fed.R. Civ.P. 56(c) and proved all the elements of its affirmative defense under 11 U.S.C. § 547(c)(2), thereby entitling it to summary judgment.

The district court had jurisdiction pursuant to 28 U.S.C. § 158(a). We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 158(d). We reverse and remand.

I.

Barclays is a British bank doing business in Seattle, Washington under a limited federal charter. CHG is a Washington corporation involved in real estate development with its principal place of business in Federal Way, Washington. This case involves two payments of interest on loans that were undersecured at the time of CHG's bankruptcy filing.

On July 15, 1982, Barclays issued a one-year line of credit to CHG up to the amount of $1,200,000 (the "CD loan"). This loan was renewed several times, the last time on October 27, 1983. The loan was evidenced by a promissory note, according to which CHG was to make monthly interest payments on the unpaid principal balance. The note contains no provision for prepayment prior to maturity. As security for this loan, CHG pledged a certificate of deposit ("CD") with Westside Federal Savings & Loan ("Westside") in the amount of $1,200,000.

The promissory note came due on October 30, 1984. On October 29, 1984, Barclays made demand for payment and advised CHG of its intention to foreclose on its security, the CD, in the event CHG did not pay the note. By letter dated October 29, 1984, CHG requested Westside to cash the CD and to wire transfer the proceeds thereof to Barclays. After deduction of the penalty for early withdrawal, the net proceeds of the CD paid to Barclays on November 2, 1984, amounted to $1,164,125.32. At the time of this payment, the principal balance of the CD loan was $1,200,000.

At all times relevant to this action, with the exception of one missed payment in June of 1984, CHG paid its monthly interest which accrued on this note. On September 17, 1984, within 90 days of the filing of CHG's petition for relief under Chapter 11, CHG issued to Barclays an interest payment check in the amount of $14,224.99 on the CD loan.

On May 1, 1984, Barclays made a second loan to CHG in the amount of $1,000,000 (the "real estate loan"). This loan was evidenced by a promissory note in which CHG agreed to pay Barclays the principal amount of the loan on December 28, 1984, plus interest payable monthly.

As security for this loan, CHG granted Barclays a deed of trust in the amount of $500,000 on 85 acres of undeveloped, wa-

terfront property on Vashon Island, King County, Washington that CHG had purchased under a real estate contract. At the time of CHG's bankruptcy filing, no payments had been made against the principal amount of this loan, and Barclays' deed of trust was junior to a deed of trust to Westside in the approximate amount of $2,000,000 and the interest of the contract vendors who were owed approximately $350,000.

The 85 acres of undeveloped Vashon Island property subject to Barclays' deed of trust was appraised in December of 1985 as part of a larger parcel comprising 127 acres. The market value for the total 127 acres .was determined to be no more than $510,000. CHG defaulted on the underlying real estate contract and subsequently forfeited its interest in the Vashon property to the contract vendors.

As additional security for the $1,000,000 loan, CHG gave Barclays a deed of trust in the amount of $500,000 on real estate property located in Richland, Benton County, Washington. At the time of CHG's bankruptcy filing, this deed of trust was junior to a deed of trust in favor of Washington Mutual Savings Bank ("Washington Mutual") securing a loan in the principal amount of $2,122,500 and a deed of trust in favor of Westside securing a loan in the principal amount of $2,850,000. The Richland property was sold at a nonjudicial foreclosure sale on April 25, 1986 by the trustee under the Washington Mutual deed of trust. The property was purchased by Washington Mutual for $2,351,041.97.

As with the first loan, CHG failed to make the June interest payment on this real estate loan, but made all other monthly interest payments. On September 17, 1984, within 90 days of the filing of CHG's petition for relief under Chapter 11, CHG issued to Barclays an interest payment check in the amount of $12,513.89 on the real estate loan.

On December 5, 1984, CHG filed a voluntary petition in bankruptcy seeking relief under Chapter 11 of the United States Bankruptcy Code. CHG filed a complaint in the bankruptcy court two years later, on December 5, 1986, alleging that it was entitled to recover for the benefit of the estate, pursuant to 11 U.S.C. § 547(b), the above two interest payments it had made to Barclays within 90 days of filing its bankruptcy petition. In its answer, Barclays denied that the payments were preferential and asserted an affirmative defense that the payments were excepted from avoidance as preferences under 11 U.S.C. § 547(c)(2), as they were made in the ordinary course of business. On June 26, 1987, the bankruptcy court denied Barclays' motion for summary judgment based on its affirmative defense, finding as a matter of law that the section 547(c)(2) ordinary course of business exception to avoidance of preferences is not available to Barclays because the subject debts were long-term loans, not ordinary trade credits. On December 4, 1987, the bankruptcy court granted CHG's motion for summary judgment, finding that the interest payments were preferential and thus subject to avoidance.[1]

On appeal to the district court, Barclays did not contest that the transfers were preferential, but instead renewed its earlier argument that interest payments on long-term debt are covered by section 547(c)(2), and that the transfers at issue did fit within the requirements of that section. The district court agreed, and granted summary judgment to Barclays on April 29, 1988.[2] It is from this district court order that the instant appeal is taken.

## II.

The bankruptcy court's findings are reviewed independent of the district court's decision, as this court is in as good a position as the district court to review

---

**1.** The bankruptcy court awarded judgment against Barclays in the amount of $26,738.88, plus prejudgment interest from December 5, 1986, the date of the commencement of the adversary proceeding, in the amount of $3,208.67, and costs in the amount of $60.00, for a total judgment of $30,007.55.

**2.** This order was subsequently amended by the district court's amended order entered June 13, 1988. The district court's decision is published as *In re CHG Int'l Inc.*, 87 B.R. 647 (W.D.Wash. 1988).

those findings. *In re Bialac,* 712 F.2d 426, 429 (9th Cir.1983). The bankruptcy court's conclusions of law are subject to a *de novo* review, and its findings of fact are reviewed under a clearly erroneous standard. *In re Wolf & Vine,* 825 F.2d 197, 199 (9th Cir.1987). The grant of summary judgment to appellant CHG by the bankruptcy court and the grant of summary judgment to appellee Barclays by the District Court are reviewed *de novo. Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986).

### III.

CHG contends first that the interest payments on its long-term loans to Barclays cannot be excepted from avoidance under the ordinary course of business exception as a matter of law. Next, CHG argues that the district court erred in holding that the two interest payments at issue were contemporaneous exchanges and excepted from avoidance on that basis, regardless of the applicability of section 547(c) to payments on long-term debt. CHG's third contention is that even if it loses the above two arguments, the district court applied the incorrect legal standard to Barclays' summary judgment motion, and therefore a reversal is necessary.

Because we conclude that interest payments on long-term debt were not intended to be covered under the ordinary course of business exception, and that CHG's obligation to make the interest payments at issue accrued when the notes were signed, we need not reach the third issue raised by appellants. We address the first two issues in turn.

### A.

■ The bankruptcy court found that the interest payments on the CD and real estate loans were preferential as a matter of law and could thus be avoided under 11 U.S.C. § 547(b), which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Barclays did not controvert that the interest payments it received from CHG fall within this section, but established to the district court's satisfaction an affirmative defense under section 547(c)(2), which provides:

(c) The trustee may not avoid under this section a transfer—

.    .    .    .    .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

.    .    .    .    .

A brief exposition of the history of and policies behind section 547 is necessary to properly resolve the issues in this case. The foremost purpose behind the voidable-preference provision is to assure fair or equal treatment of all creditors within the same class. H.R.Rep. No. 595, 95th Congr., reprinted in 1978 U.S.Code Congr.

& Admin.News 5787, 5963, 6138–40; *In re Enserv Co., Inc.,* 64 B.R. 519, 521 (Bankr. 9th Cir.1986), *aff'd,* 813 F.2d 1230 (9th Cir.1987). Thus, if a debtor "prefers" a certain creditor by making payments on an antecedent debt to him shortly before filing for bankruptcy, the trustee can avoid or undo that preference. Such a payment would necessarily hurt other similarly situated creditors by depleting the estate.

A second policy behind section 547 is to discourage a race by the creditor to collect payment while the debtor is still marginally solvent, or a race to the courthouse to force the debtor into bankruptcy, when waiting might allow the debtor to regain his financial footing and not have to declare bankruptcy at all. Were there no rule allowing avoidance of preferences, a creditor would have a strong incentive to hound the debtor with demands for collection or petition the debtor into involuntary bankruptcy immediately so that the debtor could not deplete his assets trying to keep afloat. House Report at 6329.

The section 547(b) provision on voidable preference does not force a debtor out of business by making his suppliers wary of trading with him, knowing he might be able to recall all recent payments made to them. Under section 547(c)(1), a trustee may not avoid a transfer made as a "contemporaneous exchange" for new value given to the debtor, such as, for example, a cash purchase of goods or services. This creates a problem for a debtor who does not want to pay cash, because his later payments for goods and services provided on credit may be deemed payment of antecedent rather than current debt, and his

suppliers would be reluctant to deal other than on a cash basis if they suspect him of being insolvent. Section 547(c)(2) was intended to complement the contemporaneous exchange section. *Barash v. Public Fin. Corp.,* 658 F.2d 504, 511 (7th Cir. 1981). As originally enacted in 1979,[3] section 547(c)(2) required that the debtor's payment to the creditor be made within 45 days after the debt was incurred. "Payments made within the 45-day credit cycle were so close to 'contemporaneous' that they were not to be treated as payments on 'antecedent' debts." *In re RDC Corp.,* 88 B.R. 97, 99 (Bankr.W.D.La.1988).

The rationale for both the old "current expense" rule and for the section 547(c)(2) exception is the same: the payment does not diminish the estate, is not for an antecedent debt, and allows the debtor to remain in business. *See* Kaye, *Preferences Under the New Bankruptcy Code,* 54 Am. Bankr.L.J. 197, 201–02 (1980); *Barash,* 658 F.2d at 511.

The Bankruptcy Amendment and Federal Judgeship Act ("BAFJA") amended the Code in 1984 to eliminate the 45–day limit.[4] Prior to this amendment, the 45–day limitation very clearly precluded long-term loans from coming within the exception. The issue we must decide in this case is whether Congress intended to fundamentally change the scope of the ordinary course exception by including more than transactions which are substantially contemporaneous exchanges. Cases and scholarly commentary[5] have gone both ways, but the better view is that the amendment was intended to eliminate an artificial time limit, and nothing more.

---

**3.** The former Bankruptcy Act, superseded in 1979 by the Bankruptcy Code, contained no exceptions to the trustee's power to avoid preferential transfers. However a judicially-created exception, called the "current expense" rule, protected many transfers that are currently protected under section 547(c)(2). *See Marshall v. Florida Nat'l Bank,* 112 F.2d 380, 382 (5th Cir. 1940); 3 Collier on Bankruptcy ¶ 60.23 at 874 (14th ed. 1977).

**4.** Pub.L. No. 98–353.

**5.** Commentators who suggest that section 547(c)(2) applies only to payments on short-

term debt include Duncan, *Loan Payments to Secured Creditors as Preferences Under the 1984 Bankruptcy Amendments,* 64 Neb.L.Rev. 83, 87–91 (1985); Broome, *infra* note 9. Commentators who believe this section now applies to payments on long-term debt include Weintraub & Resnick, *From the Bankruptcy Courts,* 17 U.C. C.L.J. 263, 264 (1985); DeSimone, *infra* note 9. The leading bankruptcy treatise hedges by stating that it is arguable that the elimination of the 45–day limit allows long-term obligations to be excepted. 4 Collier on Bankruptcy ¶ 547.10 (15th ed. 1988).

There is little legislative history accompanying the 1984 Amendment.[6] Congress had initially settled on the 45–day limitation because it perceived that 45 days reflected the typical billing cycle of transactions intended to fall within that exception. Levin, *An Introduction to the Trustee's Avoiding Powers*, 53 Am.Bankr.L.J. 173, 186 (1979).[7] This 45–day limitation had been the subject of numerous complaints by consumer lenders,[8] trade creditors, and commercial paper issuers. Trade creditors complained that the trade credit periods in many industries were longer than 45 days, and commercial paper issuers were required to artificially shorten the maturity dates of commercial paper. Additionally, there was a flood of litigation centering on the 45–day requirement. In answer to these complaints, Congress eliminated the 45–day limitation.[9] Long-term lenders had not been active in seeking this change in preference law, but a literal and superficial reading of the new section 547(c)(2) appears to remove the primary obstacle which excluded these loans from the exception.

However, most cases interpreting this section hold that it does not cover payments on long-term loans. They do this by finding either that Congress did not intend section 547(c)(2) to except long-term debt from avoidance, that long-term debt is not incurred in a debtor's ordinary course of business, or both.

In *In re Bourgeois*, 58 B.R. 657 (Bankr. W.D.La.1986), the first case to squarely address this issue in its holding, the court held that principal and interest payments by the debtor to a bank on long-term loans

were not intended by the 1984 Amendment to fall within the section 547(c)(2) exception to avoidance of preferential transfers. The court noted that Congress did not intend to change the spirit of the section, i.e., the exemption from avoidance of trade credit transactions which are substantially contemporaneous exchanges.

"To hold such payments on long term loans to be in the ordinary course of business within the meaning of 547(c)(2) would be to flout the clear intent of that subsection, and the entire policy of the preference provisions as a whole. Such a holding would virtually denude the preference provisions of the Code of any meaning at all". *Id.* at 660.

This argument is very persuasive. If the exception were to include long-term debt, this would neutralize the effect of the preference section by excepting almost every kind of payment a debtor makes during the 90–day period. Essentially there would be nothing left for the debtor's trustee to avoid.[10] Such a significant shift in the congressional policy behind preference law favoring equality of distribution should not be presumed given the lack of legislative history demonstrating that such a shift was intended.

The district court rejected the *Bourgeois* court's holding that long-term loans are not incurred and payments are not made in the ordinary course of business by noting that section 547(c)(2) provides an exception for payments "made in the ordinary course of business *or financial affairs....*" *In re CHG Int'l*, 87 B.R. at 650 (emphasis in original). The language in section 547(c)(2)

---

**6.** A Senate Report accompanied S445, the Omnibus Bankruptcy Improvements Act of 1983, which was the forerunner to BAFJA. The legislative history to that Act states that "[t]he [45–day] limitation [contained in section 547(c)(2)] places undue burdens upon creditors who receive payment under business contracts providing for billing cycles greater than 45 days." S.Rep. No. 98–65, 98th Cong., 1st Sess. 60 (1983).

**7.** Mr. Levin was a member of the House Judiciary Committee staff which drafted the Code.

**8.** Congress answered the consumer lenders' complaints by enacting 11 U.S.C. § 547(c)(7).

**9.** Broome, *Payments on Long–Term Debt as Voidable Preferences: The Impact of the 1984 Bankruptcy Amendments*, 1987 Duke L.J. 78; DeSimone, *Section 547(c)(2) of the Bankruptcy Code: The Ordinary Course of Business Exception Without the 45 Day Rule*, 20 Akron L.Rev. 95, 103 (1986).

**10.** The only transfers left for the trustee to avoid would be those transfers the debtor intended to favor certain creditors. Such fraudulent transfers are already prohibited by other Bankruptcy Code sections.

referring to "financial affairs" was included merely to ensure that consumer transactions would be covered by the preference provisions. S.Rep. No. 989, 95th Congr., 1st Sess. 178 (1977), reprinted in 1978 U.S. Code Congr. & Admin.News, 5787, 5874 (1978). That language in no way affects the analysis of the *Bourgeois* court.

Almost every court that has considered the question has followed *Bourgeois*. In *In re RDC Corp.*, 88 B.R. 97 (Bankr.W.D. La.1988), the court held that a debtor's repayment of a 90–day working capital loan, whose maturity had been extended several months, was not a transaction within section 547(c)(2). The court found that:

> Trade credit transactions are exactly that—a two-way exchange. They further the policies of the Code because they allow the debtor to continue on in business and in the narrow context of ongoing trade exchange, they do not diminish the estate for it is replenished by the goods or services paid for. A long-term loan is an antecedent debt in the traditional sense. The monthly payments of interest do not represent ongoing trade transactions because the decision to pay them was made far in advance of the payment (at the time the loan was negotiated) and in fact nothing is exchanged at the time of the payments with the debtor which helps him to continue in business. There is merely an outflow of money from the estate.

*Id.* at 99, citing *In re Acme–Dunham, Inc.*, 50 B.R. 734, 741–42 (D.Me.1985).

Other recent cases following *Bourgeois* include *In re Jackson*, 90 B.R. 793 (Bankr. D.S.C.1988) (payment by debtor to his mother-in-law on an unsecured long-term business loan is not excepted from avoidance by section 547(c)(2)) and *In re Control Electric Inc.*, 91 B.R. 1010, 1017 (Bankr.N.D.Ga.1988) (transfers made by electrical subcontractor to bank in payment of long-

term loan were not the type which Congress intended to be excepted from avoidance provisions of section 547(b)).

The reasoning of these cases is sound. It would be against the congressional policy of pro rata distribution to let a long-term creditor who has the foresight or power to demand monthly interest or principal payments to receive three payments in full while those creditors who are awaiting quarterly interest or principal payments to receive nothing (or only whatever percentage all unsecured creditors receive upon distribution).

Further, it does not foster the congressional policy of encouraging creditors to engage in short-term and trade credit transactions to allow long-term creditors to make use of this exception. A bank is unlike a supplier, because it analyzes a debtor's credit worthiness before it agrees to make the loan. Allowing a bank to exempt payments on long-term debt will not encourage it to do business with the debtor because the bank *already* made the decision to do business with the debtor. Conceivably a creditor could force the debtor into bankruptcy sooner, but he would gain little by doing this. He won't receive any higher percentage of the estate, may still have prior payments avoided, and perhaps waiting and working with the debtor will allow the debtor to recover and pay in full.

The appellee was able to point to only one case, *In re Xonics, Inc.*, Adversary No 85A 1096, slip op., 1986 WL 22193 (Bankr. N.D.Ill. Dec. 24, 1986), that rejects *Bourgeois*. However, the Seventh Circuit opinion affirming the *Xonics* decision expressly adopts the *Bourgeois* analysis and cites it by name. *In re Xonics Imaging, Inc.*, 837 F.2d 763, 766 (7th Cir.1988) (debtor's late payment of rent and taxes were not in the ordinary course of business).[11]

---

11. There is a recent case, however, which finds that section 547(c)(2) was not intended to be restricted only to trade credit, and disapproves *Bourgeois* to this extent. *Fidelity Sav. & Invest. Co. v. New Hope Baptist*, 880 F.2d 1172 (10th Cir.1989). That court would include commercial paper and similar debt. In *Fidelity* the

debtor was in the business of regularly borrowing money from investors for terms of less than one year and then lending it out at higher interest rates. The court found these loans to be close enough to commercial paper to be included in section 547(c)(2), and incurred in the ordinary course of the debtor's business. The

Based upon the preceding analysis, we conclude that payments on long-term loans should not be included in the section 547(c) exception as a matter of law.

### B.

■ The district court made no holding as to whether section 547(c)(2) applies only to short-term credit transactions. Rather, the court held that even accepting this argument the interest payments at issue here were a contemporaneous exchange, and not a payment on an antecedent debt, citing *In re Iowa Premium Serv. Co., Inc.,* 695 F.2d 1109 (8th Cir.1982) (a debt for interest is incurred daily as interest accrues for purposes of the 45–day rule under prior law).[12]

■ This reasoning is faulty in several respects. The loan made by Barclays to CHG is an antecedent debt within the meaning of section 547(b). Whether a debt is current or antecedent depends upon when it was incurred, a term which is not defined by the Bankruptcy Code. A debt is incurred when the debtor first becomes legally bound to pay. *In re Gold Coast Seed Co.,* 751 F.2d 1118, 1119 (9th Cir.1985) (debt under forward contract to purchase seed from creditor was incurred upon shipment of the seed). This is generally when "the debtor obtains a property interest in the consideration exchanged giving rise to the debt." 4 Collier on Bankruptcy ¶ 547.38. The law of the state of Washington governs CHG's obligation under the promissory notes. *See Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). Under Washington law, the obligations of CHG to pay interest is fixed upon execution of the note. *Pedersen v. Fisher,* 139 Wash. 28, 32, 245 P. 30, 32 (1926). Thus the obligation to pay interest arose when CHG received the loan, not when the interest payments were made.

The creditor in *In re Western World Funding, Inc.,* 54 B.R. 470 (Bankr.D.Nev. 1985), advanced the same argument accepted by the district court in the instant case and by the *Iowa Premium* court: that its receipt of interest was not on account of an antecedent debt, but was incurred monthly when it became due. The *Western World* court rejected this argument, finding that the debt for principal and interest was incurred as soon as the promissory notes were signed and the funds transferred to the debtor. *Id.* at 477. *Accord Barash,* 658 F.2d at 509 (debt was incurred when consumer entered into installment loan agreement with creditors and not as each monthly payment fell due).

The *Western World* court, in deciding this issue of whether interest payments were debts incurred within 45 days of the bankruptcy filing under the old section 547(c)(2), specifically declined to follow the *Iowa Premium* majority, agreeing instead with the dissent and finding that a debt for interest is incurred when the debtor obtains the funds, even if at that time the debtor's obligation to pay interest is unmatured and contingent. *Western World,* 54 B.R. at 480. This is so because once the debtor receives the funds, consideration for payment of principal and interest has passed. The analogy between the use of money over time and the use of a utility service, as was drawn by the *Iowa Premium* court and the district court judge in the instant case, is inappropriate. *Iowa Premium,* 695 F.2d at 1111; *In re CHG Int'l,* 87 B.R. at 649. An energy user consumes additional energy each month, but a long-term borrower receives his lump-sum loan only once and becomes obligated to pay for it at that time (though his payments may be spread out over many months).

Even were we to accept the holding in *Iowa Premium,* the district court's reliance

---

analysis of this opinion is somewhat weak, and its only case support is *In re CHG Int'l,* 87 B.R. at 648, which is the order, prior to amendment, from the case at bar. Since we are reversing that case, it is obviously no longer good law.

Moreover, the *Fidelity* court expressly refused to decide whether it agrees with the cases that hold that longer term loans that come due before bankruptcy are excepted from treatment as

a preference, being "mindful of the argument ... that excepting payments on long-term obligations often will do little to augment the debtor's prebankruptcy resources." *Fidelity,* 880 F.2d at 1177.

**12.** The same holding, based upon identical facts, was reached in *In re Smith–Douglass, Inc.,* 842 F.2d 729 (4th Cir.1988).

on that case is misplaced. The 5–3 *en banc* panel in that case held that a fixed obligation to pay interest arose only after each day the debtor retained use of the money. However, this ruling was based upon the contingent nature of the requirement to pay interest; the promissory note in that case was subject to payment on demand by the creditor and prepayment at any time at the option of the debtor. Thus the court reasoned that a fixed obligation to pay interest arose only after every day the debtor retained use of the money; the debtor had no obligation to pay interest at all if he chose to prepay. *Iowa Premium*, 695 F.2d at 1111–12. In the case at bar, neither of the notes in question makes reference to a prepayment option prior to maturity. Under Washington law, if a note is silent regarding payment the borrower has no right to pay before maturity. *Pedersen*, 139 Wash. at 32, 245 P. at 32.

## IV.

We reverse the district court's grant of summary judgment to Barclays and remand for the district court to reinstate that portion of the bankruptcy court's summary judgment for CHG that is consistent with this opinion. Congress did not intend 11 U.S.C. § 547(c)(2) to include payment on long-term debt. The two interest payments at issue in this case were payments on antecedent debt under Washington law, and not current expenses.

Because the district judge decided that the section 547(c) exception precluded avoidance of the two interest payments at issue as preferential transfers, she did not reach two other questions on appeal, namely whether 11 U.S.C. § 547(b)(5) precluded CHG from avoiding the $14,224.99 interest payment on the CD loan as a preference, and whether the bankruptcy court awarded CHG prejudgment interest at the correct rate. We do not reach these issues either, and the district judge may resolve them on remand.

REVERSED AND REMANDED.